## STATE OF CONNECTICUT *v.* PABLO E. SANTOS
### (SC 16924)

Sullivan, C. J., and Borden, Katz, Palmer and Vertefeuille, Js.

Argued September 26, 2003—officially released January 27, 2004

*Jeanne M. Zulick*, special public defender, for the appellant (defendant).

*Denise B. Smoker*, assistant state's attorney, with whom, on the brief, were *Patricia M. Froehlich*, state's attorney, and *Roger Caridad*, senior assistant state's attorney, for the appellee (state).

*Opinion*

VERTEFEUILLE, J. The dispositive issue in this appeal is whether the trial court properly denied the defendant's motion to suppress narcotics seized following a warrantless patdown search for weapons. The defendant, Pablo E. Santos, appeals from the trial court's judgment of conviction, rendered following a conditional plea of nolo contendere, of possession of narcotics with intent to sell in violation of General Statutes § 21a-277 (a).[1] He claims that the actions of the police constituted a search and seizure violative of his

---

[1] General Statutes § 21a-277 (a) provides in relevant part: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any controlled substance which is a hallucinogenic substance other than marijuana, or a narcotic substance . . . for a first offense, shall be imprisoned not more than fifteen years and may be fined not more than fifty thousand dollars or be both fined and imprisoned . . . ."

state constitutional rights under article first, §§ 7, 8 and 9,[2] of the Connecticut constitution and the first, fourth and fourteenth[3] amendments to the United States constitution.[4] We agree with the defendant that the police detained him without a reasonable and articulable basis to suspect that criminal activity had occurred or was

---

[2] The Connecticut constitution, article first, § 7, provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

The Connecticut constitution, article first, § 8, provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel; to be informed of the nature and cause of the accusation; to be confronted by the witnesses against him; to have compulsory process to obtain witnesses in his behalf; to be released on bail upon sufficient security, except in capital offenses, where the proof is evident or the presumption great; and in all prosecutions by indictment or information, to a speedy, public trial by an impartial jury. No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law . . . ."

The Connecticut constitution, article first, § 9, provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

[3] The first amendment to the United States constitution provides in relevant part: "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble . . . ."

The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The fourteenth amendment to the United States constitution, § 1, provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

[4] We resolve this issue under the state constitution because it is well established that the reasonable and articulable suspicion standard by which we review a warrantless patdown search is the same under both the federal and state constitutions. See, e.g., *State* v. *Torres*, 230 Conn. 372, 382–83, 645 A.2d 529 (1994) ("[t]he reasonable and articulable suspicion standard also defines the showing required for a prearrest detention under the fourth and fourteenth amendments to the federal constitution . . . and under our state constitution" [citation omitted]; *State* v. *Lamme*, 216 Conn. 172, 184, 579 A.2d 484 (1990) (federal reasonable and articulable suspicion standard defines when detentions are " 'clearly warranted by law' " under article first, § 9, of state constitution).

about to occur, and, accordingly, we reverse the judgment of the trial court.[5]

Prior to trial, the defendant filed a motion to suppress the seized narcotics, which he claimed were seized illegally during a warrantless patdown search of his person for weapons. The court held a suppression hearing on the motion during which the following facts were adduced. On September 7, 2001, at 10:23 p.m., Troopers Chick Bistany and Steven McManaway of the Connecticut state police, Troop K, conducted a routine patrol of the athletic fields on Plains Road (athletic fields) in the town of Windham. The athletic fields consist of a soccer field, softball field, tennis courts and basketball courts, all of which are accessible from a common parking lot. Although not equipped with lighting for nighttime use, the publicly owned athletic fields do not close at sunset, and there are no signs posted restricting public access or limiting the use of the fields to daylight hours.[6] The athletic fields are noted for a high instance of criminal activity, including drug transactions and prostitution,[7] and state police, at the request of the town, therefore patrolled the area nightly.

When the troopers entered the athletic fields' parking lot on the evening in question, they noted the presence

[5] Because we conclude that the initial investigatory detention of the defendant was not supported by a reasonable and articulable basis for suspicion of criminal activity, it necessarily follows that the patdown search was illegal. See, e.g., *State* v. *Trine*, 236 Conn. 216, 223–24, 673 A.2d 1098 (1996), citing *Terry* v. *Ohio*, 392 U.S. 1, 24, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968) ("[i]f, during a *lawful* investigatory detention, the officer reasonably believes that the detained individual might be armed and dangerous, the officer may undertake a patdown search of the individual to discover weapons" [emphasis added]).

[6] Susan Johnson, a former selectman for the town of Windham and a former member of the zoning board of appeals, testified at the suppression hearing that she was familiar with the town ordinances and, to the best of her knowledge, there were no ordinances limiting the use of the athletic fields. Johnson pointed out that, although there are other town ordinances posted at the athletic fields, there are no postings limiting or restricting public access.

[7] Bistany testified at the suppression hearing that hypodermic needles and small bags of the type used to package narcotics have been found in the past at the athletic fields.

of two parked automobiles.[8] McManaway drove to the right of the parking lot toward one of the automobiles,[9] while Bistany drove to the left, toward the other, a white Chevrolet Lumina, in which the defendant was a passenger. Bistany turned on his vehicle's spotlight to illuminate the area around the Lumina. At this point, neither trooper witnessed any illegal activity.

As Bistany approached the Lumina, which was parked with its front end abutting the athletic fields, he observed three individuals standing outside the car, and a fourth, the defendant, exiting the right passenger side of the vehicle. Bistany stopped his cruiser behind the Lumina, at a slight angle, and trained the spotlight on the car and the individuals. Bistany then activated his cruiser's mobile video recorder and his body microphone, allowing him to record all visual and audio events transpiring in front of his cruiser.[10]

Bistany, who was in full uniform, including his state police badge, identifying state police patches, service revolver, and cap stun,[11] exited his cruiser and approached the four men. Bistany testified that, as he got closer to the men, he noted that they were "pacing back and forth . . . [and] appeared visibly nervous . . . ." Bistany stopped at the rear of the Lumina, approximately four feet from the men, and asked them what he characterized at the suppression hearing as routine questions, including what they had been doing at the athletic fields and where they had come from. One of the men responded that they were "not causing any trouble" and that they were "just driving around."

[8] Bistany entered the parking lot first, followed by McManaway. Both cruisers were outfitted with light bars on their roof and were identifiable as police cars. Neither trooper illuminated his cruiser's flashing lights.

[9] McManaway testified at the suppression hearing that the car he approached was occupied by two young persons who provided positive identification and said they were leaving shortly. After checking their identification, he allowed them to leave without further questioning.

[10] The videotape was entered into evidence at the defendant's suppression hearing before the trial court, and has been reviewed by this court.

[11] Cap-stun is an irritant designed to disable and distract a subject temporarily.

At this point, Bistany asked the men, who were standing on either side of the Lumina, to come to the rear of the Lumina, in front of his cruiser. When the four men complied and were standing in a line in front of him, Bistany asked who was driving the Lumina. One of the defendant's companions identified himself as the driver and Bistany requested to see his identification. When the individual who had identified himself as the driver began to move toward the driver's side of the vehicle,[12] Bistany instructed him to stop and return to where he had been standing. At this point, Bistany, out of concern for his safety, instructed all four men to remain still and submit to a patdown search.[13] Bistany proceeded to conduct a patdown search of each individual. As Bistany began searching the first man, McManaway returned from patrolling the opposite side of the parking lot and assisted Bistany by watching the three individuals not being searched. When Bistany searched the first individual, he noted that the individual felt wet and was covered in grass clippings. Bistany asked the individual why that was so, and the man responded that he and the other three men had been wrestling on the ground prior to Bistany's arrival.[14]

The defendant was the third person searched. Bistany testified that, when he called the defendant over to him, the defendant approached with his hands clenched. As he reached Bistany, the defendant turned around and placed his fists under his armpits. Bistany instructed the defendant to put his hands behind his back, and, after the defendant complied, he began to pat him down. Bistany told the defendant to relax and open his hands. Bistany then observed a clear plastic bag containing a

---

[12] The individual who identified himself as the driver of the automobile can be heard on the videotape stating that he thought his identification was in the car.

[13] Bistany later testified that he noticed "an odor of alcoholic beverage emanating from the males' breaths." He could not remember, however, at what point during his encounter with the men that he smelled the alcohol.

[14] Bistany testified that, at this point, his conversation with the four men was "quite light" and that he was "joking around with them."

white, powdery substance between the fingers of the defendant's right hand. The troopers subsequently arrested the defendant for possession of narcotics.[15]

The state charged the defendant with possession of narcotics in violation of General Statutes § 21a-279 (a)[16] and possession of narcotics with intent to sell in violation of § 21a-277 (a). The defendant thereafter moved to suppress the seized narcotics on the ground that the police did not have a reasonable and articulable suspicion of criminal activity that is required to conduct a valid *Terry* stop.[17] See *Terry* v. *Ohio*, 392 U.S. 1, 22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Specifically, the defendant argued in his motion that: (1) his detention was unwarranted because the troopers did not possess a reasonable and articulable suspicion that a crime had been or was about to be committed; (2) the *Terry* patdown of his person was unwarranted because the troopers did not have a reasonable suspicion or probable cause to suspect that the defendant was presently armed and dangerous; and (3) consequently, the exclusionary rule and the fruit of the poisonous tree doctrine required suppression of all evidence obtained during and subsequent to the stop and seizure. Following an evidentiary hearing, the trial court denied the defendant's motion to suppress, concluding that, when Bistany decided to detain and pat down the defendant, he had a reasonable and articulable suspicion for doing so.

---

[15] The troopers confiscated eight small plastic bags of the substance, which subsequently was determined to be cocaine.

[16] General Statutes § 21a-279 (a) provides in relevant part: "Any person who possesses or has under his control any quantity of any narcotic substance . . . for a first offense, may be imprisoned not more than seven years or be fined not more than fifty thousand dollars, or be both fined and imprisoned . . . ."

[17] "Under *Terry* . . . an officer may forcibly stop a suspect and engage in a 'stop and frisk' investigation if the officer has a reasonable and articulable suspicion that the suspect has committed or is about to commit a crime." (Citation omitted.) *State* v. *Czyzewski*, 70 Conn. App. 297, 303 n.7, 797 A.2d 643, cert. denied, 261 Conn. 911, 806 A.2d 49 (2002).

Pursuant to General Statutes § 54-94a[18] and Practice Book § 61-6,[19] the defendant entered a conditional plea of nolo contendere to the second count, possession of narcotics with intent to sell, in order to appeal immediately the trial court's denial of the motion to suppress. The trial court accepted the defendant's conditional plea and, after the state nolled the first count, possession of narcotics, the trial court rendered judgment of guilty on the charge of possession of narcotics with intent to sell. The defendant subsequently appealed from the judgment to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

On appeal, the defendant claims that the trial court improperly denied his motion to suppress and challenges both the trial court's factual findings and its legal conclusion. First, the defendant contends that the trial

[18] General Statutes § 54-94a provides: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress or motion to dismiss, the defendant after the imposition of sentence may file an appeal within the time prescribed by law provided a trial court has determined that a ruling on such motion to suppress or motion to dismiss would be dispositive of the case. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress or the motion to dismiss. A plea of nolo contendere by a defendant under this section shall not constitute a waiver by the defendant of nonjurisdictional defects in the criminal prosecution."

[19] Practice Book § 61-6 (a) (2) provides in relevant part: "(i) When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's (a) motion to suppress evidence based on an unreasonable search or seizure, (b) motion to suppress statements and evidence based on the involuntariness of a statement, (c) or motion to dismiss, the defendant after the imposition of sentence may file an appeal within the time prescribed by law. The issue to be considered in such appeal shall be limited to whether it was proper for the court to have denied the motion to suppress or the motion to dismiss. A plea of nolo contendere by a defendant under this subsection shall not constitute a waiver by the defendant of nonjurisdictional defects in the criminal prosecution. The court shall not accept a nolo contendere plea pursuant to this subsection where the denial of the motion to suppress would not have a significant impact upon the disposition of the case in the trial court. The court shall also decline to accept such a nolo contendere plea where the record available for review of the denial of the motion to suppress or motion to dismiss is inadequate for appellate review of the court's determination thereof. . . ."

court improperly found that the defendant and his companions were "sweating" and "pacing back and forth" during the questioning by Bistany. The defendant further claims that, based on these erroneous factual findings, the trial court improperly concluded that there existed a reasonable and articulable basis for the *Terry* stop and that the subsequent patdown search was valid. We agree with the defendant.

We begin our analysis by setting forth the applicable standard of review. "Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Luurtsema*, 262 Conn. 179, 184, 811 A.2d 223 (2002).

When considering the validity of a *Terry* stop, our threshold inquiry is twofold. *State* v. *Oquendo*, 223 Conn. 635, 645, 613 A.2d 1300 (1992). First, we must determine "at what point, if any, did the encounter between [the police officer] and the defendant constitute an investigatory stop or seizure." Id. Next, "[i]f we conclude that there was such a seizure, we must then determine whether [the police officer] possessed a reasonable and articulable suspicion at the time the seizure occurred." Id., 645–46.

We must first determine, therefore, at what point, if at all, a seizure occurred. "We have . . . defined a person as seized under our state constitution when by means of physical force or a show of authority, his freedom of movement is restrained. . . . In determining the threshold question of whether there has been a seizure, we examine the effect of the police conduct at the time of the alleged seizure, applying an objective

standard. Under our state constitution, a person is seized only if in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."[20] (Citation omitted; internal quotation marks omitted.) *State* v. *James*, 237 Conn. 390, 404, 678 A.2d 1338 (1996). Therefore, "[w]hether there has been a seizure in an individual case is a question of fact." *State* v. *Ostroski*, 186 Conn. 287, 292, 440 A.2d 984, cert. denied, 459 U.S. 878, 103 S. Ct. 173, 74 L. Ed. 2d 142 (1982).

In the present case, the state concedes that a seizure occurred when Bistany instructed the defendant and his acquaintances to remain still and submit to a patdown search.[21] Specifically, this was the point in time after Bistany had assembled the men, including the defendant, at the rear of the Lumina and in front of the police cruiser, and after Bistany had instructed the driver of the automobile to return to where he had been standing after he had attempted to retrieve his identification from inside the automobile.

We next turn, therefore, to the pivotal issue in this case: whether the trial court properly concluded that the seizure was based on a reasonable and articulable suspicion of criminal activity. The determination of whether a reasonable and articulable suspicion exists rests on a two part analysis: "(1) whether the underlying factual findings of the trial court are clearly erroneous; and (2) whether the conclusion that those facts gave

[20] It is well established that article first, §§ 7 and 9, of the Connecticut constitution afford greater protection to the citizens of this state than does the federal constitution in the determination of what constitutes a seizure. *State* v. *Wilkins*, 240 Conn. 489, 506, 692 A.2d 1233 (1997); see also *State* v. *Miller*, 227 Conn. 363, 382, 630 A.2d 1315 (1993) (article first, § 7, of Connecticut constitution is broader than federal counterpart); *State* v. *White*, 229 Conn. 125, 148–49, 640 A.2d 572 (1994) (article first, § 9, provides greater protection than federal constitution).

[21] The defendant, in his brief, contends that a seizure actually occurred at numerous earlier points in time prior to the time Bistany told the four men that they would be searched. Because we conclude that Bistany did not have a reasonable and articulable suspicion of criminal activity as of the time he instructed the defendant and the others to wait to be searched,

rise to such a suspicion is legally correct." *State* v. *Wilkins*, 240 Conn. 489, 496, 692 A.2d 1233 (1997).

"Under the fourth amendment to the United States constitution and article first, §§ 7 and 9, of our state constitution, a police officer is permitted in appropriate circumstances and in an appropriate manner to detain an individual for investigative purposes if the officer believes, based on a reasonable and articulable suspicion that the individual is engaged in criminal activity, even if there is no probable cause to make an arrest." (Internal quotation marks omitted.) *State* v. *Lipscomb*, 258 Conn. 68, 75, 779 A.2d 88 (2001); see also *Alabama* v. *White*, 496 U.S. 325, 330–31, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990); *Terry* v. *Ohio*, supra, 392 U.S. 22.

"[I]n justifying [a] particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (Internal quotation marks omitted.) *State* v. *Lipscomb*, supra, 258 Conn. 75; see also *Terry* v. *Ohio*, supra, 392 U.S. 21; *State* v. *Januszewski*, 182 Conn. 142, 148–49, 438 A.2d 679 (1980). "In determining whether a detention is justified in a given case, a court must consider if, relying on the whole picture, the detaining officers had a particularized and objective basis for suspecting the particular person stopped of criminal activity." *State* v. *Lipscomb*, supra, 76.

We begin this inquiry by reviewing the facts as found by the trial court in its memorandum of decision, which formed the basis for its conclusion that the investigatory detention of the defendant was justified. In denying the defendant's motion to suppress, the court found the following facts: "[M]embers of the Connecticut state police . . . were conducting a patrol check of the [athletic] fields of Plains Road in Windham . . . . [T]he area is noted for the high instance of criminal activity

---

the time at which the state concedes he was seized, we do not need to determine whether a seizure occurred at any earlier time.

and there have been numerous instances of used hypodermic needles . . . and empty narcotics baggies being found in the area. . . . When [Bistany] approached the . . . individuals, they appeared nervous, were sweating, and were pacing back and forth. The officer also noted an odor of alcohol emanating from the individual's breath." The defendant specifically challenges the trial court's findings that the defendant and his companions were sweating and pacing back and forth, claiming that these findings are clearly erroneous. We address each factual challenge separately.

After reviewing the videotape of the encounter, we cannot reasonably discern any indicia of perspiration on the defendant or his companions. The footage, shot from the police cruiser, at night, under the glare of the spotlight, is grainy and provides no support for a finding that the defendant or his companions were perspiring. Furthermore, neither Bistany nor McManaway testified at the suppression hearing that the defendant or his companions were sweating. In addition, the state conceded at oral argument in this matter that there was no testimony that they were perspiring. Thus, the court's finding that the defendant and his companions "were sweating" cannot stand.

We also find no support for the trial court's finding that the defendant and his companions were "pacing back and forth." Although Bistany testified that the four men were "pacing back and forth," our review of the videotape leads us to conclude otherwise. The videotape depicts the defendant and his friends standing at the rear of their car, occasionally shifting their weight from one foot to the other while standing in the glare of the spotlight, answering Bistany's questions. That movement cannot properly be characterized as "pacing back and forth."

Having concluded that these factual findings were clearly erroneous, we must determine whether the trial

court's legal conclusion—that a reasonable and articulable suspicion of criminal activity justified the intrusion—can be supported by the remaining facts found, namely, that Bistany noted the "odor of alcohol emanating from the individual's breath" and that "the area is noted for the high instance of criminal activity . . . ." We conclude that these remaining facts alone do not satisfy the requirement that there be a *reasonable and articulable* suspicion that the defendant had engaged or was about to engage in criminal activity.

First, the fact that Bistany smelled alcohol cannot reasonably support the investigatory detention of the defendant. Consumption of alcoholic beverages by persons over the age of twenty-one is not unlawful unless accompanied by other conduct, such as the operation of a motor vehicle while under the influence of alcohol or with a blood alcohol level above the legal limit.[22] There is no evidence in the record that the individual who smelled of alcohol was the defendant.[23] There is no evidence that the defendant was the driver of the vehicle.[24] Moreover, while Bistany testified that he noticed the odor of alcohol at "*some point*," (emphasis added) he conceded that he could not accurately recall at *which point* he smelled the alcohol. There is no evidence in the record indicating that Bistany detected the odor of alcohol *prior* to the seizure. Thus, the fact that the officer detected the odor of alcohol on *some* person at *some* point during the encounter cannot provide a reasonable and articulable basis for suspecting criminal activity.

Second, the mere presence of the defendant and his companions in a high crime area at night is not suffi-

---

[22] See, e.g., General Statutes § 14-227a, entitled, "Operation while under the influence of liquor or drug or while having an elevated blood alcohol content."

[23] At the time of his arrest, the defendant was twenty-two years old. The record does not reveal the ages of the defendant's companions.

[24] The state, for the first time at oral argument, impliedly suggested that the defendant and his companions were violating § 9-1 of the Windham town ordinance, which prohibits possession of open containers or consumption of alcoholic beverages in publicly owned parking areas. There is no evidence

ciently indicative of criminal activity to justify the investigatory detention. Although, "[t]he character of the neighborhood and the officer's knowledge of narcotics distributions in the area may properly be considered"; (internal quotation marks omitted) *State* v. *Turner*, 62 Conn. App. 376, 399, 771 A.2d 206 (2001); *State* v. *Moreland*, 23 Conn. App. 495, 497, 582 A.2d 212 (1990); a person's physical presence in an area where police anticipate criminal activity, alone, does not justify an arbitrary investigatory detention of that person. See *State* v. *Scully*, 195 Conn. 668, 678–79 n.15, 490 A.2d 984 (1985).

When considering the impact of a defendant's presence in a high crime area as a factor in a *Terry* stop analysis, this court previously has relied on the United States Supreme Court's decision in *Brown* v. *Texas*, 443 U.S. 47, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979), the facts of which are similar to the present case. See, e.g., *State* v. *Mikolinski*, 256 Conn. 543, 549, 775 A.2d 274 (2001); *State* v. *Mitchell*, 204 Conn. 187, 195, 527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987); *State* v. *Torres*, 197 Conn. 620, 626, 500 A.2d 1299 (1985); *State* v. *Scully*, supra, 195 Conn. 673. In *Brown*, two police officers conducted a *Terry* stop of a defendant whom they observed walking in the opposite direction of another man in an alley located in an area known for drug trafficking. *Brown* v. *Texas*, supra, 48. Although the men were a few feet apart when the police observed them, one officer testified that he believed that they previously had been together. Id., 49. He further testified that the police had stopped the defendant because he looked suspicious and they had never seen him in that area before. Id. The United States Supreme Court concluded that "[t]he fact that [the defendant] was in a neigh-

in the record, however, to indicate that the defendant and his companions possessed open containers or consumed alcoholic beverages in the parking lot.

borhood frequented by drug users, standing alone, is not a basis for concluding that [the defendant] himself was engaged in criminal conduct." Id., 52. "The lesson from *Brown* . . . is simply that physical presence in a geographical area where the police may have reason to anticipate possible violations of the law does not in and of itself justify arbitrary investigatory stops." *State* v. *Scully*, supra, 678–79 n.15.

In the present case, we conclude that the defendant's presence in a high crime area at night, without any other facts, cannot form the basis for a reasonable and articulable suspicion that the defendant had engaged or was about to engage in criminal activity. Simply put, the record in the present case is devoid of evidence of suspicious activity. The state, in its brief, fails to articulate with specificity any criminal activity reasonably indicated by the facts and circumstances set forth in the record. The defendant's mere physical presence at the athletic fields was neither suspicious nor criminal. Without more, we cannot conclude that the trooper had a reasonable and articulable basis for suspecting criminal activity.[25]

The state likens the present case to other cases in which the denial of a motion to suppress seized contraband based on a neighborhood's unsavory notoriety have been upheld.[26] The cases relied upon by the state in its brief are factually distinguishable. For instance, the state points to *State* v. *Januszewski*, supra, 182 Conn. 149–50, in which this court upheld the trial court's

---

[25] We note that, in their briefs, both parties relied heavily on *State* v. *Oquendo*, supra, 223 Conn. 635, and *State* v. *Donahue*, 251 Conn. 636, 742 A.2d 775 (1999), cert. denied, 531 U.S. 924, 121 S. Ct. 299, 148 L. Ed. 2d 240 (2002). Because we are not persuaded that either case is factually similar to the present one, we decline to address them here.

[26] The state further relies on numerous federal and extrajurisdictional cases. We decline to address the federal cases because the Connecticut constitution affords greater protection than the fourth amendment in this area. *State* v. *Wilkins*, supra, 240 Conn. 506. Additionally, because our own precedent is well established on this issue, we see no need to address the decisions of our sister states in this opinion.

conclusion that a reasonable and articulable basis for suspicion of criminal activity existed due to the defendant's presence in a commuter parking lot during customary work hours and his "plainly furtive conduct" upon the police officer's approach.[27] Likewise, the state relies on *State* v. *Watson*, 165 Conn. 577, 585–86, 345 A.2d 532 (1973), cert. denied, 416 U.S. 960, 94 S. Ct. 1977, 40 L. Ed. 2d 311 (1974), in which this court concluded that the investigatory detention of the defendant was justified when police officers had observed the defendant drive his vehicle into the parking lot of a motel late at night, and drop off four passengers who entered the motel and, shortly thereafter, emerged from the motel hurriedly and cautiously. Finally, the state relies on *State* v. *Moreland*, supra, 23 Conn. App. 498, in which the Appellate Court concluded that the defendant's presence in an area known for drug trafficking, along with the defendant's conversation with the occupant of an automobile and a third individual and the defendant's open display of money, supported the trial court's finding that a reasonable and articulable basis for suspicion existed to warrant the defendant's detention. These cases all involved conduct on the part of the defendant beyond mere physical presence in a high crime area. Unlike the present case, each involved plainly furtive, even bizarre, behavior, which, when coupled with a neighborhood's crime-ridden reputation, clearly supplied the basis for a reasonable and articulable suspicion that criminal activity was afoot.

Finally, the state argues that a reasonable and articulable suspicion of criminal activity can arise from noncriminal acts. Although we have stated that "[a]n investigative stop can be appropriate even where the police have not observed a violation because a reason-

---

[27] We note that the furtive conduct referred to in *Januszewski* consisted of the defendant crawling out of the passenger side of an automobile and under a nearby motorcycle to avoid the approaching police officer. *State* v. *Januszewski*, supra, 182 Conn. 144–45.

able and articulable suspicion can arise from conduct that alone is not criminal"; (internal quotation marks omitted) *State* v. *Lipscomb*, supra, 258 Conn. 76; the state's argument fails to recognize that, even if the acts prompting the stop are not criminal, the stop is justified only if the officer has a reasonable and articulable suspicion that *criminal activity is afoot.* "The issue is not whether the particular conduct is innocent or guilty, but the degree of suspicion that attaches to particular types of noncriminal acts." (Internal quotation marks omitted.) *State* v. *Hammond*, 257 Conn. 610, 625, 778 A.2d 108 (2001). In the present case, the noncriminal conduct that prompted the stop, i.e., the presence of four men in the parking lot of public athletic fields at night, without more, reasonably could not give rise to the belief that they were engaged in criminal activity. Accordingly, the detention and patdown search violated the defendant's constitutional rights.

Having concluded that the defendant's detention was not supported by a reasonable and articulable suspicion of criminal activity, we turn our attention to the defendant's claim that the seized narcotics must be suppressed pursuant to the exclusionary rule. It is axiomatic that "[u]nder the exclusionary rule, evidence must be suppressed if it is found to be the fruit of prior police illegality." (Internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 42, 836 A.2d 224 (2003); see also *Wong Sun* v. *United States*, 371 U.S. 471, 485, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). Because we conclude that the *Terry* stop that led to the discovery of the narcotics seized from the defendant's possession was constitutionally infirm, the trial court improperly denied the motion to suppress that evidence.

The judgment is reversed and the case is remanded to the trial court with direction to grant the defendant's motion to suppress.

In this opinion the other justices concurred.