# STATE OF CONNECTICUT *v.* RONALD F. STRANO
## (AC 23929)

Foti, Dranginis and McLachlan, Js.

Argued June 3—officially released September 21, 2004

*Moira L. Buckley,* special public defender, for the appellant (defendant).

*Denise B. Smoker,* assistant state's attorney, with whom, on the brief, was *Matthew C. Gedansky,* state's attorney, for the appellee (state).

*Opinion*

FOTI, J. The defendant, Ronald F. Strano, appeals from the judgments of conviction, rendered following his conditional pleas of nolo contendere, of robbery in the second degree in violation of General Statutes § 53a-135 under fifteen separate docket numbers and attempt to commit robbery in the second degree in violation of General Statutes §§ 53a-49 and 53a-135 under one docket number, for which his sentences on all docket numbers were enhanced pursuant to General Statutes

§ 53-202k as a result of the defendant's having committed class A, B or C felonies with a firearm. On appeal, the defendant claims that the court improperly denied his motions to suppress. We affirm the judgments of the trial court.

In its memorandum of decision denying the defendant's motions to suppress, the court found the following facts. "On January 8, 2001, a robbery was reported at Smoker's Discount World located at 435 Main Street in Manchester. The robber was described by the victims as a lone white male, wearing a gray ski mask, who displayed a small, dark handgun and demanded money from a clerk. The clerk gave the robber about $130. The robber then bound both clerks with duct tape.

"On January 24, 2001, a robbery occurred at Pete's Package Store on Windsorville Road in Vernon. The robber was described as a lone, middle-aged white male wearing a gray ski mask with one opening for the eyes. He had a small handgun and ordered the clerk to hand over money. He shoved a customer to the floor and fled on foot. The robber was described as five feet, six inches to five feet, eight inches tall. He stole approximately $60.

"On January 27, 2001, a robbery occurred at the Comfort Inn on the Hartford Turnpike (Route 30) in Vernon. The robber was described as a male wearing a gray jacket and a ski mask with a single opening for the eyes. He produced a small black revolver and ordered the clerk to the floor. The robber was described as five feet, five inches tall. He stole $386.

"On January 30, 2001, a robbery occurred at the DB Mart at 352 Hartford Turnpike (Route 30) in Vernon. The robber was described as a white male, five feet, eight inches tall with brown eyes, wearing a dark colored jacket and a dark blue or gray ski mask with a single eye opening. He displayed a small black revolver.

The car he was driving was described as a white, two door, newer model Toyota with darkly tinted windows. He stole $60.

"On February 1, 2001, a robbery occurred at the Courtyard by Marriott on Slater Street in Manchester. The robber was described by the victim as a lone white male between five feet, six inches and five feet, eight inches tall with light colored eyes, wearing a ski type mask and armed with a small dark handgun. The robber stole $275.

"On February 3, 2001, a robbery occurred at the Holiday Inn Express on Kelly Road in Vernon. The robber was described as a white male with a small black pistol, wearing a greenish gray ski mask with one eye opening, and a gray jacket. The robber was described as between five feet, six inches and five feet, eight inches tall. The robber ordered the clerk to the floor. The robber stole $400.

"On February 7, 2001, a robbery occurred at Discount Cigarette on Hartford Turnpike (Route 30) in Vernon. The robber was described as approximately thirty-five years old and about five feet, six inches tall with blue eyes. He was wearing a brownish jacket and a light colored ski mask that was not pulled over his face. He displayed a small black revolver and ordered the clerk to the floor. The car he was driving was described as a newer looking, light blue station wagon. About $450 was stolen. Utilizing computer software and information supplied by the victim, Detective Robert O'Gara of the Vernon police department developed a composite drawing of the suspect to which the victim concurred.

"On February 9, 2001, a robbery occurred at the Connecticut Motor Lodge at 400 Tolland Turnpike in Manchester. A vehicle pulled up directly in front of the office of the motel. A lone white male, five feet, six inches tall, exited the car, entered the office and con-

fronted the clerk. He was armed with a small black gun, which looked like a revolver. He demanded money from the clerk, received it and ordered her to the floor. He was wearing a ski type mask and winter type clothing. He left in a small, dull gray colored vehicle after having stolen $560.

"On February 17, 2001, a robbery occurred at the Howard Johnson's motel in Vernon. The robber was described as driving a newer model, dark green colored car. He was described as a white male, five feet, eight inches tall with dirty blond hair and blue eyes. He was wearing a gray cloth jacket, gray ski mask with a single eye opening and thick black gloves with gray suede grips. He displayed a small black revolver, which he pointed at the clerk's head. Approximately $1800 was stolen. In cooperation with the victim, Detective Don Skewes of the Vernon police department did a composite drawing of the robbery suspect. The victim had seen the suspect drive in without a mask on.

"On February 24, 2001, there was an attempted robbery at the Dunkin Donuts on Talcottville Road (Route 83) in Vernon. The robber was described as a lone white male, five feet, six inches tall, wearing a light, faded green ski mask with one eyehole, and a beige jacket. He displayed a small, dark colored revolver and ordered the clerk to the register, but the clerk refused and called 911. The suspect then fled northbound on Route 83 in an older, white Ford LTD or Galaxy automobile, away from the closest entrance to Interstate 84, which was only a short distance away.

"On February 25, 2001, there was a robbery at the Getty gasoline station at 176 Tolland Turnpike in Manchester. The robber was described as a lone white male who drove up to the station. He confronted the clerk and displayed a small antique handgun. He was wearing a ski type mask and gloves, and had green eyes. He

stole $1700 and fled in a four door, white, late 1980s to early 1990s Chevrolet automobile.

"On March 7, 2001, a robbery occurred at the DB Mart on Route 83 in Vernon. The robber was described as a white male between five feet, five inches and five feet, eight inches tall, wearing a light colored ski mask with a single eye opening and a light colored sweater with a light colored jacket. He displayed a small, black handgun. The witness thought the robber may have been Hispanic, although his skin was white. He drove a small white vehicle with no license plate on the back and headed north on Route 83. The robber stole $380.

"On March 10, 2001, the Howard Johnson's motel in Vernon was robbed again. The robber was identified by the victim, who was the same in both robberies, as the same person who robbed the motel on February 17. He was wearing a dark colored ski mask with a single eye opening, a grayish jacket and black and gray colored gloves. He displayed a small black revolver. He left in a small, light colored car with no rear license plate. He stole $276.

"On March 13, 2001, the Cape Cod Crafters store on Hale Road in Manchester was robbed. The victim described a car pulling up in front of the store and a white male with a tan ski type mask coming in and confronting the clerk and demanding money. The man's eyebrows were light colored, and he was described as short. He left in a newer vehicle, which was described as white with red trim, after stealing $275.

"On March 18, 2001, a robbery occurred at Hudlow's Exxon on the Tolland Turnpike in Manchester. A white, two door, older car with a red interior was parked directly in front of the front doors, and a white male with a green colored mask and gloves with the fingertips cut off entered the store and confronted the clerk [while] displaying a short, black handgun. The robber

was described as five feet, three inches tall. A surveillance video depicted the robber pulling up to the store in his car and entering the store.

"On March 20, 2001, at approximately 10 p.m., a robbery occurred at the 7-Eleven store at the intersection of Route 30 and Vernon Avenue in Vernon, only one-half mile from the Vernon police station. The robber was described as a white male, about five feet, five inches tall, wearing a gray ski mask with a single eyehole, and a light gray jacket. He was carrying a small black handgun. He drove a white, four door, older model vehicle. A video surveillance camera depicted a view of the robber, as described by the victim, and of the car used by the robber. The video also showed that the robber was about five feet, six inches tall on the basis of the height indicator marks on the door of the store. The robber stole $200. On the basis of the physical characteristics and the nature of the robbery, the police believed that the robbery was carried out by the same person [who carried out] the previous robberies in Manchester and Vernon.

"From the photographs of the car taken from the surveillance tape at the 7-Eleven, the police were able to determine, after consulting with the parts manager of a local Chevrolet-Buick dealer on the morning of March 21, 2001, that the car involved was a 1988, 1989 or 1990 white Buick Regal. The identification was made on the basis of the car's distinctive front grill and lights, as well as the type of ornament on the hood.

"The police departments from the adjoining towns of Vernon and Manchester worked together to solve the crimes. They formed an opinion that the robberies were being performed by one individual on the basis of clothing (winter jacket and ski mask with single eyehole), physical description of the robber (white male of short stature), the way the crime was committed

(robber wore a mask, entered and exited quickly, and acted calmly and efficiently, armed with a gun), the description of the weapon (small dark handgun), types of businesses targeted (those that would have cash) and the vehicle used (described as white in one-half of the robberies). In fact, the Howard Johnson's motel had been robbed twice by the same person.

"The locations of the robberies also aroused police suspicion that the robber resided in the area because the robberies were occurring in a defined area and, despite intensive police surveillance, the robber was able to elude police. That indicated to the police that he was familiar with the area and had a safe haven or home in the area of the robberies. They had placed surveillance on likely escape routes, such as Interstate 84, and were unsuccessful. In fact, in two instances, the robber was seen leaving the scene in the direction away from the quickest access to the highway. No similar robberies were occurring in other areas, and the number of robberies was unusual for the area. The police also believed that the robber was not a kid and had a past criminal record because he was efficient; each robbery was done in a short period of time, and there was a recklessness about the manner of the robberies. Also, first time offenders do not usually start out committing armed robberies. They also suspected that he was a drug addict on the basis of the amount of money stolen and the frequency of the crimes. The police also believed the robber may have had a police scanner because shortly after a surveillance was called off at the Holiday Inn Express, the motel was robbed.

"[During] the afternoon of March 21, 2001, the Manchester police obtained a printout from the department of motor vehicles of every 1988, 1989 and 1990 two door Buick Regal registered in the last five years. The police then reviewed the list for those registered owners who resided in Manchester, Vernon and South Windsor

because those towns border the area where the robberies had occurred. The list was disseminated to the South Windsor and Vernon police.

"The Manchester police reviewed each of the vehicles in Manchester against the information they had regarding the owner's physical description and criminal history, and also checked the actual car, if it could be located, to determine if the owner matched the description of the robber or the car matched the vehicle used in the robberies. The Vernon police did a similar review. Of the thirteen owners in Vernon and South Windsor who were on the list from the department of motor vehicles, only the defendant, who appeared on the list as owning a 1989 white, two door Buick Regal, had a criminal record. He had a criminal record of convictions for robbery and weapons. The defendant also was identified as a suspect because he was five feet, six inches tall with blue eyes and presently was living in Vernon, but had previous addresses in Manchester. His wife and children presently resided in Manchester. Those addresses also were close to the sites of a number of robberies. The defendant's present [home] address in Vernon was only a short distance from the DB Mart, which was robbed on March 7, 2001. Lieutenant Joseph Morrissey of the Manchester police department tried to locate the defendant's vehicle, but was unable to do so. The plan was to set up a surveillance of the defendant's car on March 22, 2001. The police believed, on the basis of the frequency of the robberies and the amounts stolen, that another robbery would likely occur that day.

"On March 22, 2001, at approximately 1 p.m., Officer Richard Haynes of the Vernon police department was patrolling Route 83 for signs of the suspect's vehicle and any robberies. Haynes was aware that the suspect's vehicle was a white, 1988, 1989 or 1990 Buick Regal with a red interior and that the suspect lived on Allen

Drive in Vernon. He also was expecting that another robbery would likely occur soon. While driving south on Route 83, he saw a white Buick Regal, without a front license plate, that was proceeding north. Haynes turned his vehicle around and headed north, but lost sight of the Buick. He then saw the vehicle at Thornton's gas station. The vehicle was parked against the building. Haynes thought it odd the way the car was parked because it was not at a gas pump, and it was blocking part of a parking space at a location where the station clerk could not see it. Haynes drove in to check the license plate of the vehicle and thought he might be interrupting a robbery because the car appeared unoccupied. As Haynes proceeded past the vehicle, a white male sat up after leaning over toward the passenger seat or backseat. Haynes believed that the occupant had seen him as he went by.

"Haynes checked the license plate and found that the car was registered to the defendant, of Allen Drive, and that it should have had both a front and rear license plate. Because the vehicle matched the description of that of the robbery suspect, had been parked strangely at Thornton's and Haynes thought he had interrupted a robbery, he wanted to stop the car. While running the motor vehicle check, he radioed Skewes and advised him that the defendant's car had been parked suspiciously at Thornton's and that he wanted to stop the car. Skewes said, 'Fine.' Because Skewes and the other detectives investigating the robberies were concerned that the robber may have a police scanner and therefore that the driver might know the police were following him, and because of concern that the driver might have a gun, Skewes, after consulting with Lieutenant Michael Greenier of the Vernon police department, told Haynes to stop the car. Haynes followed the car and stopped it on Allen Drive, a few yards from the defendant's house.

"Haynes called in the stop to the police department and exited the cruiser. As he did so, he noticed the operator moving around in the vehicle and that he appeared to be reaching down. Haynes suspected that he was either reaching for or hiding a gun. Haynes went to the left side of the car and asked the defendant for his license and registration, which he already had out. Haynes then went back to his cruiser to wait for backup. Haynes got out the composite of the robbery suspect he had in the cruiser. Haynes noticed that the interior of the defendant's car was red and that the defendant looked like the [person in the] composite drawing. He also noticed an uncanny resemblance between the photograph on the defendant's license and the composite. Nothing dispelled the officer's suspicion that the defendant was the suspect.

"Then, Officer Christopher Hammick, Sergeant David Orozco, Detective Stephen Chipman, Skewes and Greenier all arrived on the scene. All the police cars were parked in a vertical row directly behind the defendant's car. Skewes and Greenier also noticed that the composite matched the photograph of the defendant on [his] license. In addition, Greenier noticed that the license plate on the rear of the car was dirty, but that the screws had no rust, which indicated that the plate could have been removed. The car also had a red interior and a red stripe on each side.

"With Skewes and Haynes on the driver's side and Orozco on the passenger side, the officers approached the vehicle. Neither Haynes nor Skewes had their weapons drawn. Orozco had his weapon out in a low, ready position. When Skewes approached the vehicle, he saw a two-toned glove, like that used in the Howard Johnson's robbery, on the passenger seat and two jackets, similar to those described in the robberies, on the backseat. Skewes also believed that the car matched the car from the 7-Eleven video. It was becoming clear to him

that the defendant was the robber, and the detective became concerned that there was a gun in the car. The driver appeared nervous and a little panicky. Skewes asked him if he had any weapons or drugs, and the defendant made a quick movement or lunged with both hands toward the glove box without replying to the question. Skewes told the defendant not to reach for the box and that the police were going to search the vehicle. At that point, Haynes drew his weapon and Orozco opened the passenger side door because he thought the defendant was reaching for a weapon and, with the door closed, Orozco could not see below the door line. Skewes asked the defendant to step out of the vehicle. He then was taken out of the car to get him away from it in case a weapon was inside. The defendant was then patted down by Orozco for weapons in order to ensure the safety of the police officers. No weapons were found on his person.

"After conferring with Greenier, Skewes decided to do a protective sweep of the passenger compartment of the car for weapons. Skewes asked the defendant for consent to search the vehicle, but he refused. Skewes then did a 'patdown' of the vehicle. He looked anywhere a weapon could be hidden yet reached. He looked under the driver's seat and then started to move the heavier of the two jackets when he felt a heavy object in the pocket of the jacket, which felt like a gun. He looked in the pocket and saw a blue bag that he took out and, when he opened it, found a ski mask with one eyehole in it that matched the description of the ski mask used in some of the robberies. Surgical gloves also were found in the bag, and a small black revolver fell out of the bag. Skewes yelled, 'Gun,' in a matter of seconds after he got to the car. He then stopped the patdown of the car. The defendant immediately was handcuffed and placed under arrest."

The defendant subsequently was charged with robbery in the second degree under fifteen separate docket numbers and attempt to commit robbery in the second degree under a sixteenth docket number. There also was a part B information under each of the docket numbers, alleging that the defendant had committed a felony with a firearm in violation of § 53-202k. The defendant then filed motions to suppress all seized property as well as any admissions or confessions that he may have made, claiming that they were obtained as a result of an illegal stop and subsequent illegal search. After a hearing, the court denied all of the defendant's motions to suppress, concluding that (1) the police had a reasonable and articulable suspicion that the defendant was the perpetrator of the robbery at the 7-Eleven, as well as the perpetrator of the other robberies, and that he was about to commit another robbery at Thornton's until he saw Haynes, (2) the seizure was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure and (3) the police had a reasonable belief that he was armed and dangerous, thereby making lawful their protective search for weapons.

On August 22, 2002, the defendant entered a plea of nolo contendere to robbery in the second degree and committing a felony with a firearm under each of the sixteen docket numbers, conditioned on his right to appeal from the court's denial of his motions to suppress pursuant to General Statutes § 54-94a and Practice Book § 61-6. The defendant was sentenced to a total effective term of forty years incarceration. This appeal followed.

The defendant claims that the court improperly denied his motions to suppress. Specifically, the defendant claims that (1) the initial stop of his vehicle was not supported by a reasonable and articulable suspicion that he had engaged in or was about to engage in crimi-

nal activity, (2) the police did not have a reasonable belief that he was armed and dangerous, and (3) the scope of the seizure and of the subsequent searches of his person and vehicle amounted to an arrest that was unsupported by probable cause. We will address each of the defendant's arguments in turn.

"We first set forth the standard of review and legal principles that guide our analysis. Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Jenkins*, 82 Conn. App. 111, 115, 842 A.2d 1148 (2004).

I

The defendant first claims that the stop of his vehicle was not supported by a reasonable and articulable suspicion that he had engaged in or was about to engage in criminal activity. We do not agree.[1]

The federal and state law of search and seizure in this area is well settled. "Under the fourth amendment to the United States constitution and article first, [§ 7] . . . of our state constitution, a police officer is permitted in appropriate circumstances and in an appropriate manner to detain an individual for investigative purposes if the officer believes, based on a reasonable and articulable suspicion that the individual is engaged in criminal activity, even if there is no probable cause to

---

[1] The court concluded, and the parties do not dispute, that the defendant was seized when Haynes stopped his vehicle.

make an arrest." (Internal quotation marks omitted.) *State* v. *Santos*, 267 Conn. 495, 505, 838 A.2d 981 (2004).

"Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion. . . . Thus, [r]easonable and articulable suspicion is . . . based not on the officer's inchoate and unparticularized suspicion or hunch, but [on] the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." (Citation omitted; internal quotation marks omitted.) *State* v. *Jenkins*, supra, 82 Conn. App. 123. "What constitutes a reasonable and articulable suspicion depends on the totality of the circumstances. . . . The determination of whether a specific set of circumstances provides a police officer with a reasonable and articulable suspicion of criminal activity is a question of fact for the trial court and is subject to limited appellate review." (Internal quotation marks omitted.) *State* v. *Gaston*, 82 Conn. App. 161, 165, 842 A.2d 1171 (2004).

"An appeal challenging the factual basis of a court's decision that a reasonable and articulable suspicion exists requires that we determine, in light of the record taken as a whole, (1) whether the underlying factual findings of the trial court are clearly erroneous; and (2) whether the [court's] conclusion that those facts gave rise to such a suspicion is legally correct." (Internal quotation marks omitted.) Id., 166.

In the present case, the court concluded properly that the police had a reasonable and articulable suspicion that the defendant had engaged in or was about to engage in criminal activity. Prior to Haynes' stopping the defendant after observing him at Thornton's, the police had information that a short, white male driving

a 1988, 1989 or 1990 white, two door Buick Regal had robbed the 7-Eleven on Route 30 in Vernon two days before. The police also had information that (1) a male matching the description of the person who robbed the 7-Eleven had robbed, or attempted to rob, fifteen other places of business in Manchester and Vernon in the two preceding months, and (2) on the basis of the centralized locations of the robberies and the police's inability to capture the robber despite repeated surveillance, the robber lived locally. From that information, and from a search of the relevant motor vehicle and criminal records, the police reasonably determined that the defendant was the only owner of the type of vehicle in question meeting the physical characteristics of the suspect from the robberies who had a criminal record of convictions for robbery and possession of weapons. For those reasons, we cannot conclude that the court improperly determined that the police had a reasonable and articulable suspicion that the defendant was the perpetrator of the fifteen armed robberies and one attempted armed robbery, thereby making the stop of the defendant's vehicle a lawful stop pursuant to *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

The defendant argues, however, that the police did not have a reasonable and articulable suspicion because they unreasonably (1) assumed that there was only one perpetrator of the robberies, and that the perpetrator lived in Vernon, Manchester or South Windsor and owned a white Buick Regal, (2) singled him out on the basis of his criminal record, (3) singled him out on the basis of his physical characteristics and age, and (4) used a composite sketch of the perpetrator of the armed robberies that reflected a generic image that bears a likeness to many individuals. Specifically, the defendant seems to argue that each of the aforementioned pieces of information standing alone did not create a reason-

able and articulable suspicion that he had engaged in or was about to engage in criminal activity.

The defendant, however, appears to misinterpret the meaning of reasonable and articulable suspicion. "What constitutes a reasonable and articulable suspicion depends on the totality of the circumstances." (Internal quotation marks omitted.) *State* v. *Gaston*, supra, 82 Conn. App. 165. Consequently, although that information, when viewed in isolation, might not form the basis of a reasonable and articulable suspicion, when viewed under the totality of the circumstances, the information afforded the police a reasonable and articulable suspicion that the defendant had engaged in or was about to engage in criminal activity.

For the foregoing reasons, we cannot conclude that the court improperly determined that the police had a reasonable and articulable suspicion to conduct a *Terry* stop.

## II

Next, the defendant claims that even if we assume arguendo that the police had a reasonable and articulable suspicion to conduct a *Terry* stop, they did not possess a reasonable belief that he was armed and dangerous, thereby making their protective search of his person and vehicle for weapons unlawful. Specifically, the defendant argues that the passage of time between the last robbery for which he was a suspect and the *Terry* stop minimized "the public safety concern that is present when officers investigate a crime that has just occurred or is in the process of occurring . . . ." We do not agree.

"If, during the course of a lawful investigatory detention, the officer reasonably believes that the detained individual might be armed and dangerous, the officer may undertake a patdown search to discover weapons."

(Internal quotation marks omitted.) *State* v. *Arline*, 74 Conn. App. 693, 698 n.13, 813 A.2d 153, cert. denied, 263 Conn. 907, 819 A.2d 841 (2003). "Additionally, under the federal constitution, an officer conducting a *Terry* stop of an automobile may search the passenger compartment of the automobile for weapons, limited to areas where the weapon might be hidden, if he or she reasonably believes the suspect is potentially dangerous." *State* v. *Wilkins*, 240 Conn. 489, 496, 692 A.2d 1233 (1997).

Although the defendant is correct that the most recent armed robbery for which he was a suspect did not immediately precede the stop of his vehicle, we cannot conclude that the court improperly determined that the police still possessed a reasonable belief that he was armed and dangerous. On the basis of the information available to the police, including their suspicion that the defendant was the perpetrator of fifteen armed robberies and one attempted armed robbery, their belief that he still was armed and dangerous was reasonable under the circumstances. Moreover, Haynes discovered the defendant in his vehicle at Thornton's gasoline station, which the police believed was a type of business similar to those that had been robbed, and saw that the vehicle was parked in an unusual manner such that the store clerk could not see the defendant. As a result, notwithstanding the fact that the defendant never actually attempted to rob Thornton's, Haynes still reasonably believed that he was planning to do so, thereby making it reasonably likely that the defendant possessed a weapon. Last, Haynes testified that after stopping the defendant, he noticed him moving around in the vehicle and apparently reaching down and suspected that he either was reaching for or hiding a gun.

Additionally, more information became available to the police during the lawful *Terry* stop of the defendant that further supported their belief that he was armed

and dangerous. Specifically, the police discovered that (1) it appeared as if the rear license plate recently had been removed, as had the license plate on the vehicle that was described in the robberies, (2) the vehicle had a red interior and a red stripe on each side similar to that of the vehicle that was described in the robberies, (3) a two-toned glove and two jackets similar to those described in the robberies were visible on the passenger seat and backseat, respectively, and (4) the defendant made a quick movement to his glove compartment instead of responding to questions concerning whether he had any drugs or weapons on his person or in his vehicle.[2]

For the foregoing reasons, we cannot conclude that the court improperly determined that the police possessed a reasonable belief that the defendant was armed and dangerous.

The defendant argues, however, that the police could not have possessed a reasonable belief that he was armed and dangerous because Haynes left him unattended in his vehicle after obtaining his license and registration. Although the defendant is correct that he was left alone in his vehicle while Haynes returned to his police cruiser to check the defendant's license and registration, the court reasonably could have concluded

---

[2] The defendant also claims that it was clearly erroneous for the court to have found that he made "a quick movement or lunged" toward the glove box without answering a question regarding his possession of guns or weapons. Specifically, the defendant argues that the court's finding was clearly erroneous because Haynes testified that the defendant "lunged" toward the glove box whereas the police report stated: "We then asked if we could check and he said he didn't have anything and then made a quick move to the glove box to show it was empty."

On the basis of the evidence in the record and because it is not within the province of this court to retry facts or pass on the credibility of the witnesses, we cannot conclude that the court's finding was clearly erroneous. See *State* v. *Finan*, 82 Conn. App. 222, 238, 843 A.2d 630, cert. granted on other grounds, 269 Conn. 901, 851 A.2d 304 (2004).

that this was a reasonable step to take under the circumstances. Haynes returned to his cruiser to compare the defendant's driver's license to the composite sketch of the suspect in the armed robberies, which was done to confirm the officer's suspicion that the defendant was the perpetrator of the armed robberies and not, as the defendant argues, because Haynes believed him to be harmless. Moreover, Haynes remained in his vehicle, leaving the defendant unattended, because he was waiting for backup, which also was a reasonable step to take when a suspect is believed to be armed and dangerous.

Additionally, as previously discussed, there were several pieces of information that became evident to the police after backup officers arrived to assist Haynes, which further confirmed the police belief that the defendant was armed and dangerous. Consequently, even if we assume, as the defendant argues, that Haynes could not have had a reasonable belief that the defendant was armed and dangerous because the officer left the defendant unattended in the defendant's vehicle, the record supports a finding that such a belief became reasonable once the police discovered the new information.

For the foregoing reasons, we cannot conclude that the court improperly determined that the police had a reasonable belief that the defendant was armed and dangerous, thereby permitting them to conduct a protective search of the defendant's person and vehicle for weapons.[3]

---

[3] The defendant also argues that the court ignored the fact that the officers made no attempt to investigate his behavior and did not question him about his presence at Thornton's. "When the officer has a reasonable belief that the individual whose suspicious behavior he is investigating . . . is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." (Internal quotation marks omitted.) *State* v. *Kyles*, 221 Conn. 643, 663, 607 A.2d 355 (1992). Because the police already had a reasonable belief that the defendant was armed and dangerous,

## III

Last, the defendant claims that even if we assume arguendo that the initial stop was supported by a reasonable and articulable suspicion, the scope of the seizure and the subsequent searches of his person and vehicle were unreasonable. Specifically, the defendant argues that the initial stop was transformed into an arrest that was unsupported by probable cause because the police used an excessive show of authority.

"When a reasonable and articulable suspicion exists, the detaining officer may conduct an investigative stop of the suspect to confirm or to dispel his suspicions. *Terry* v. *Ohio*, supra, 392 U.S. 24; *State* v. *Federici*, 179 Conn. 46, 51, 425 A.2d 916 (1979); *State* v. *Acklin*, 171 Conn. 105, 112, 368 A.2d 212 (1976)." *State* v. *Gaston*, supra, 82 Conn. App. 165.

The record supports a finding that the police acted appropriately under the circumstances to investigate their suspicions that the defendant was the perpetrator of the armed robberies and that he currently was armed and dangerous. The defendant argues, however, that the police used an excessive show of authority, which transformed the *Terry* stop into an arrest that was unsupported by probable cause by (1) utilizing their flashing lights on their vehicles, (2) wearing uniforms, (3) having their gun holsters unsnapped or having their guns unholstered and pointed at the ground, (4) taking the defendant's license and registration, thereby making it legally impossible for him to leave, (5) the presence of five additional officers arriving "in marked and unmarked vehicles, [who] exited their vehicles and basically surrounded the defendant while he was in his vehicle," and (6) asking him if he possessed any weap-

it would be unreasonable to require the officers to investigate their suspicions further, and risk physical harm to themselves and others.

ons or drugs instead of first questioning him about his presence at Thornton's.

The defendant's argument is wholly without merit. If the defendant were correct in his assertion, then it would be nearly impossible for the police to stop anyone without effecting an arrest. Such measures are a common and necessary component to law enforcement, and we cannot conclude that under the circumstances of this case, they amounted to an excessive show of authority as a matter of law. Furthermore, the defendant's contention that the five additional officers "basically surrounded" him is not supported by the record. Although five additional officers arrived as Haynes' backup, the court reasonably could have found that their cruisers were parked in a row behind the defendant's vehicle and that only three officers approached the defendant's vehicle, two of whom had their guns holstered. The record reflects, therefore, that the officers did not surround the defendant in his vehicle, as the defendant argues. For those reasons, the defendant's argument that the police used an excessive show of authority, thereby transforming the *Terry* stop into an arrest that was unsupported by probable cause, must fail.

The judgment is affirmed.

In this opinion the other judges concurred.