******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MCDONALD, J., concurring in part and dissenting in part.

I respectfully dissent from parts I, III and IV of the majority opinion and concur as to part II.

## ENGAGING IN PURSUIT

As to part I of the majority opinion, I do not agree that the state produced sufficient evidence to reasonably support the charge of engaging in pursuit "at Wall Street" in violation of General Statutes § 14-223 (b). I accordingly respectfully dissent as to part I.

In describing some of the facts the jury could find and in sustaining the conviction, the majority points to evidence that Sergeant Todd Bergeson, after he received a radio call from Officer Deana Nott requesting a motor vehicle stop to issue a ticket to the defendant, Daniel G., for interfering or creating a disturbance, went to Jefferson Street near the CVS pharmacy seeking the defendant's van. In doing so, the Sergeant activated his cruiser's siren and overhead lights which turned on his dashboard camera. On Jefferson Street, Sergeant Bergeson observed the defendant's van ahead of him where it turned left onto Wall Street and thereafter turned onto Summer Street, then Redden Avenue, then Colman Street and into his residence, at times at speeds of a few miles per hour.

The majority rejects the defendant's claim that the videodisc produced from the dashboard camera in Sergeant Bergeson's cruiser conclusively established that the defendant did not increase his speed or try to elude Sergeant Bergeson at Wall Street,[1] and concludes that the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt.

On appeal, we must ask whether there is a "reasonable view of the evidence that supports the jury's verdict of guilty . . . ." (Internal quotation marks omitted.) *State* v. *Silva*, 285 Conn. 447, 454, 939 A.2d 581 (2008).

The statute required by its plain terms that the defendant increase his speed in an attempt to escape or elude an officer when signaled to stop by the use of the siren or flashing lights. In this case, the videodisc from Sergeant Bergeson's cruiser does not support the § 14-223 (b) conviction, but rather renders the verdict unreasonable in view of the physical facts recorded by electronic means considered with the trial testimony and audio recordings of police radio transmissions.[2] See *State* v. *DeJesus*, 236 Conn. 189, 196, 672 A.2d 488 (1996); *State* v. *Bradley*, 39 Conn. App. 82, 91, 663 A.2d 1100 (1995), cert. denied, 236 Conn. 901, 670 A.2d 322 (1996).

As the trial court record reflects, the New London

police cruisers were equipped with dashboard video cameras, which produced videodiscs of much of the incident. Additionally, audio discs of the actual messages between officers; and between the defendant and the police dispatcher; and between the police dispatcher and police officers were produced. These discs were introduced at the defendant's trial. Similar video evidence was sufficient to convince our Supreme Court in *State* v. *Santos*, 267 Conn. 495, 838 A.2d 981 (2004), to reverse a trial court's decision after its review of a videotape which it found to be contrary to the physical facts testified to before that trial court.

As to Sergeant Bergeson's signal to stop, the video disc reflects that he used the siren and lights to pass through an intersection and through two red lights before entering Jefferson Street well behind the defendant's vehicle. Then, in following at a "considerable distance"[3] behind the defendant's vehicle, the siren and lights were used to clear the left hand lane of Jefferson Street of a vehicle between the Sergeant's cruiser and the defendant's van. In contrast, the common, recognized method, familiar to all motorists, for signaling a stop is that the police cruiser using its siren or flashing lights pulls directly behind the vehicle to be stopped so the cruiser can be parked close to the rear of the stopped vehicle. This use of flashing lights to stop a vehicle is described in the prosecutor's summation when he referred to a driver looking at flashing lights in the "rearview mirror." See footnote 17 of this opinion. The videodisc shows Sergeant Bergeson first reached that position directly behind and close to the defendant's van at the top of Wall Street on Summer Street.

As to increasing speed "at Wall Street," the videodisc shows the defendant's van was far ahead of Sergeant Bergeson at the intersection of Jefferson Street and Wall Street, but, at the top of Wall Street, Sergeant Bergeson was directly and closely at the back of the defendant's van. This shows the defendant had not increased his speed away from Sergeant Bergeson's cruiser at Wall Street as charged in the information and testified to by Sergeant Bergeson as "accelerating up Wall Street" and as "driving away from" him.[4] Furthermore, Sergeant Bergeson did not testify to any speed that the defendant was driving when the defendant was properly signaled to stop at any time.

Sergeant Bergeson originally testified that when he first began to display his emergency lights on Jefferson Street, the defendant was "a little bit further up . . . maybe three or four, maybe five car lengths in front of" him. Sergeant Bergeson had testified that he was directly behind the defendant while driving forty to forty-five miles per hour, not an "exact speed," on Jefferson Street in a twenty-five miles per hour zone. In later testimony, however, after being shown the video of the event, which was recorded from Sergeant Berge-

son's police cruiser dashboard camera, Sergeant Bergeson admitted that he was not close to the defendant's van, and that, as the video showed, another vehicle was in the left lane between the defendant's van and Sergeant Bergeson's cruiser. This vehicle only pulled over as Bergeson approached Wall Street. Further, the videodisc shows Jefferson Street in the area of Wall Street was a two lane, one-way street, and the defendant's van was in the left hand lane prior to turning onto Wall Street. The videodisc shows that there was no stop sign on Jefferson Street at the intersection of Jefferson Street and Wall Street. Sergeant Bergeson added that he was not following the New London police pursuit policy for engaging in pursuit and that he did not call out his own speeds during any pursuit. Moreover, the defendant's left turn onto Wall Street from Jefferson Street was visible to Sergeant Bergeson's video camera and to Sergeant Bergeson.[5] Finally, Sergeant Bergeson also admitted that he was driving faster than the defendant to catch up to him.

The videodisc shows the defendant turned left onto Wall Street, and at its T intersection with Summer Street, at the top of the Wall Street hill, applied his brakes at the stop sign, put on his right turn signal and took a right onto Summer Street, heading toward Redden Avenue. The videodisc also shows that, as the turn was completed at the top of Wall Street, Sergeant Bergeson caught up to the rear of the defendant's vehicle to signal a stop.

As Sergeant Bergeson was following the defendant onto Redden Avenue, at the next turn, he radioed other officers, later recorded onto an audio disc, that he was "turning everything off." He knew that the defendant was going "right to his house" and he did not want to cause any problems.[6] The defendant arrived at his nearby house on Colman Street approximately sixty-six seconds after Sergeant Bergeson began following him from a distance on Jefferson Street.

Furthermore, the evidence had to show that the defendant was attempting to elude or escape the officer by speeding. The evidence from the video and audio discs does not reasonably support a finding that the defendant's conduct when signaled to stop was motivated by his intent to elude or escape Sergeant Bergeson. Sergeant Bergeson was forced to recognize this, when he said he discontinued the use of "everything" on Redden Avenue and said that the defendant was headed toward his home (on nearby Colman Street). At this point, Sergeant Bergeson testified at trial, he was disengaged from pursuit. The officers knew the identity of the defendant, knew his home was his destination, and Nott knew the defendant's daughter was with him.[7]

Furthermore, there was no increased speed shown on the videodisc while the van applied its brakes at

every stop sign from the top of Wall Street and signaled the direction it was turning, all toward the defendant's home. At each intersection, Sergeant Bergeson testified, his speed following the defendant was a few miles per hour. Sergeant Bergeson followed the defendant's van as if in a slow procession toward the defendant's home once he had caught up to the van as it turned onto Summer Street.

As to the majority's reference to the defendant hearing Nott's call for assistance from the CVS lot, the audio disc of the call from Nott to Sergeant Bergeson reflects Sergeant Bergeson was asked to "hit a motor vehicle stop on it and maybe give him a ticket for interfering or . . . creating a disturbance," to which Sergeant Bergeson stated, "Yeah. He's taking off right now." Thus, the defendant had already left in his van as the call was being made. Moreover, the statute explicitly requires that the defendant be signaled to stop by a siren or flashing lights. General Statutes § 14-223 (b).

The majority states that the cruiser videodisc reflects that the defendant made a "sudden" or "abrupt" left turn onto Wall Street from Jefferson Street, without braking. Here, the video shows Jefferson Street was a two lane, one-way street at its intersection with Wall Street, a side street with no stop sign on Jefferson Street.

In the presence of this contemporaneous contrary video and audio evidence, I would reverse the defendant's conviction for engaging Sergeant Bergeson in pursuit "at Wall Street" as unreasonable.

I agree with part II of the majority opinion that § 14-223 (b) is not unconstitutionally vague because this statute's plain language may be read by ordinary people to understand what conduct is prohibited. *State* v. *Stephens*, 301 Conn. 791, 805–806, 22 A.3d 1262 (2011). I do not agree, however, with the majority's statement that the trial court did not, by implication, find that the officers were outside their duties when they pursued and arrested the defendant. The court did find the officers had no constitutional justification to support an arrest for interfering with Nott and dismissed count one at the close of the state's case. As such, the stop could be found outside the officer's duties as set forth in my dissent from part III of the majority opinion.

## FAILURE TO CHARGE ON DEFENDANT'S TWO THEORIES OF DEFENSE

As to part III of the majority opinion, the defendant filed a request to charge the jury as to freedom of speech under the first amendment to the United States constitution and article first, § 5, of the Connecticut constitution.[8] The court refused to give any part of that instruction because it concluded that the request was not relevant to the charges, including engaging in pursuit, to be considered by the jury. However, I do not

agree that the requested charge was not relevant to the charges of engaging the officer in pursuit and of obstructing Sergeant Bergeson in the performance of his duty.

The standard to be used in considering the evidence as to the relevance of the charge is that the court reviews the evidence in the light most favorable to supporting the proposed charge. See *Levesque* v. *Bristol Hospital, Inc.*, 286 Conn. 234, 247, 943 A.2d 430 (2008).

There was relevant evidence of Nott's interaction with the defendant at the CVS pharmacy parking lot in New London on the afternoon of April 23, 2009, and of Sergeant Bergeson's later interaction with the defendant that afternoon.

Nott testified at trial that she was assigned to investigate a minor two car motor vehicle accident that occurred on Jefferson Street in New London. Following the accident, both motor vehicle operators had gone into the nearby CVS parking lot and called the police, who arrived in the person of Nott. Nott spoke to both drivers, took their insurance information, and looked at their licenses.

Nott testified the defendant and his six year old daughter were also in the CVS parking lot. The defendant produced evidence at trial that they were picking up a pain medication prescription from CVS for the daughter written that day by her doctor, and which was to be taken every four hours as needed.

Nott also testified as follows: she was in her police cruiser doing paperwork after speaking to the operators involved in the accident, when the defendant came out of the pharmacy and began to speak to Dustin Colburn, one motorist involved in the accident. The defendant asked Colburn if Nott was going to give him a ticket, to which Colburn stated that he hoped not. The defendant then stated to Colburn that Nott was "[on] the wrong end of a lawsuit." (Nott later testified that she was the defendant in a civil rights lawsuit brought by the defendant.) The defendant had also asked Colburn if Nott was bothering him and stated that Nott was "a no good cop or a bad cop . . . ." The defendant also asked Colburn for his name and telephone number. At this, Nott exited her police cruiser and instructed the defendant to "get in his car and go away," and Nott did not speak to Colburn at this time.

Nott also testified that the defendant did not leave then, but the defendant later went to his van and with his daughter drove onto Jefferson Street.

A police audio disc reveals that Nott was talking over the police radio with Sergeant Bergeson, the shift supervisor, and asked for a motor vehicle stop. Although she knew the defendant, Nott told Sergeant Bergeson that "he" was following her, had taken her picture, and was asking the people involved in the acci-

dent if she was going to give them a ticket and so forth. Nott asked Sergeant Bergeson to stop "him" in his motor vehicle and "maybe" give him a ticket for interfering with an officer or creating a disturbance, to which Sergeant Bergeson replied, "Yeah. He's taking off right now. What happened?"[9] Nott replied, "He's been following me, and, uh, taking my picture and then asking the people that are involved in the accident, um, if I'm giving them a ticket, so forth and so on."

Nott also testified at trial that she was "not so much" bothered by the defendant calling her no good and a bad cop. Nott also testified she was not proud of being sued.

After the defendant exited the CVS parking lot, Nott testified, she decided to leave the parking lot and go to the defendant's home. At that time, Nott returned the documents to the two drivers and told them they were free to leave. Before then leaving, Nott radioed police headquarters that she was clear from the accident and available for other work.

Sergeant Bergeson, a trained and experienced police officer of sixteen years, testified at trial that he was near the CVS parking lot when he received the radio call from Nott. He then went over to Jefferson Street in his cruiser while displaying his emergency lights and siren. The police videodisc shows after going through two red lights, Sergeant Bergeson began following the defendant's van at a "considerable" distance on Jefferson Street, up to Wall Street, a steep side road.[10] Nott had not mentioned the defendant's name to Sergeant Bergeson in her radio transmission to him. However, Sergeant Bergeson knew that the driver on Jefferson Street was the defendant because he recognized the defendant's van, which bore his business' name. Sergeant Bergeson testified he was also a defendant in the same civil rights case involving Nott and knew the defendant. Sergeant Bergeson also conceded at trial, as did Nott, that it is not illegal to take a photograph of a police officer on duty.

Sergeant Bergeson testified that after the defendant pulled into his backyard carport, he parked behind the defendant's van across the driveway in front of the defendant's house with the siren still on. Sergeant Bergeson proceeded to the driver's side of the defendant's van as the defendant was exiting. Sergeant Bergeson had told the defendant that he was under arrest, and had directed him to get out of his vehicle. Sergeant Bergeson observed that the defendant's daughter was crying while she was in the front passenger seat. Upon approaching the defendant on foot, Sergeant Bergeson "pulled a Taser on [the defendant] . . . ." He acknowledged that the Taser "shoots" approximately 50,000 volts of electricity, is considered a dangerous weapon,[11] and can "hurt" someone.[12] Sergeant Bergeson agreed that after he pulled out the Taser, he saw the defendant

reenter his vehicle, close the door, and call the police station using his cell phone. At that time, Sergeant Bergeson, over the police radio as recorded on audio disc, stated to other officers that he would "take him out and Taser him if [he had] to."[13]

In his call to the police dispatcher, as recorded on the audio disc, the defendant had reported that he had been threatened by the police and asked to speak to a captain or a lieutenant,[14] which the requested jury instruction would have described as speech protected by the first amendment. After he reported the incident, the defendant was instructed by the dispatcher to submit to the officers. As recorded by videodisc, the defendant then exited his van as instructed by the dispatcher. At the conclusion of the defendant's telephone call, the police dispatcher called Sergeant Bergeson and informed him of the defendant's call to the police dispatcher.

Other police officers also had arrived at the defendant's house, including Nott and Officer Josh Bergeson (Officer Bergeson), a half-brother of Sergeant Bergeson. Officer Bergeson testified at trial that he heard the little girl "crying, kind of wailing, almost," in the front passenger seat of the van. As Sergeant Bergeson testified, after the defendant left his van, Sergeant Bergeson returned the Taser to its holster. The videodisc from Sergeant Bergeson's cruiser shows Officer Bergeson handcuffing the defendant with his hands behind his back as Sergeant Bergeson watched nearby. The videodisc from Sergeant Bergeson's cruiser then showed Sergeant Bergeson putting the defendant down with a deprecating gesture as he passed him in handcuffs. Sergeant Bergeson did so by taking his upraised arm with his palm put down and bringing it down toward his body as the defendant passed by.

When the defendant was arrested, with his daughter's medication still in the van, his daughter was taken by a neighbor whom the defendant had called. The neighbor testified at the trial. Sergeant Bergeson testified he did not recall discussing the daughter's medication with the defendant, although the videodisc shows a conversation between the defendant and Sergeant Bergeson. When he was released from the police station, the defendant went to the hospital where he presented with two sprained wrists and a contusion to his flank. The defendant's medical records in evidence reflect the defendant (at age forty-six) also suffers from a cardiac disease, including high cholesterol and hypertension.

The defendant's jury trial had begun with the defendant facing four counts: (1) interference with Nott at the CVS parking lot, (2) risk of injury to his minor daughter by engaging the police in pursuit with his daughter in the vehicle, (3) engaging Sergeant Bergeson in pursuit, and (4) interfering with Sergeant Bergeson's attempt to arrest him by locking his vehicle. At the

conclusion of the state's case, the court granted the defendant's motion for a judgment of acquittal as to the first count charging interference with Nott, finding that because the defendant's statements to Colburn at the CVS did not rise to "fighting words," and were protected by the first amendment to the United States constitution, and there was no evidence that the defendant did anything to interfere with or delay Nott's accident investigation. The jury, however, was only instructed not to consider the charge involving Nott and not to speculate as to the reason. Under those instructions, the first amendment's freedom of speech guarantee, therefore, would have no bearing on the jury's consideration of the remaining charges, although all the defendant's statements about Nott remained in the record and were not addressed in the jury instructions. If given, the charge would have at least removed evidence of the defendant's remarks to Colburn as supporting the defendant's guilt of the remaining charges and contradicted part of the prosecutor's rebuttal argument as set forth below. As to prejudice, the prosecutor could and did improperly refer to the constitutional principles of freedom of speech as "some talk" and stated improperly the defendant should have awaited Nott's leaving to insult her record.

During deliberations, the jury sent the court a note asking for the court to reread the definition and instruction regarding a "personal frolic." The court then repeated the instruction to the jury that the officer "in the performance of his duties" must be "simply acting within the scope of what he is employed to do. The test is whether the police officer is acting within that scope or is engaged in a personal frolic of his own." As phrased, this instruction could lead the jury to believe if an officer acts as an officer, he is not engaged in a personal frolic. The requested instruction would indicate to the contrary that action taken in derogation of the defendant's freedom of speech rights was illegal and not in keeping with the officer's duty to act lawfully.

I would conclude that Sergeant Bergeson's conduct toward the defendant, threatening deadly force with a Taser when he knew that the defendant had brought his daughter home, evidence that Sergeant Bergeson knew that the defendant's photographing Nott was not illegal, the fact that the offending words used by the defendant were not "fighting words," and were protected by the first amendment and referred to the defendant's lawsuit against Nott and Sergeant Bergeson, combined with Sergeant Bergeson's deprecating gesture putting down the defendant as he was being led away, could support a finding that Bergeson was motivated by personal feelings arising from the defendant's past interactions with him and Nott, including an existing civil rights lawsuit by the defendant against them both. The jury had to consider the issue of a personal animus, but it did not have before it the consti-

tutional infirmity of Nott's request to Sergeant Bergeson to stop and issue a summons to the defendant for taking her picture and, as Nott testified, the defendant calling her "a no good or a bad cop," which are not fighting words.

Fighting words consist of speech that "by [its] very utterance inflict injury or tend to incite an immediate breach of peace." *Chaplinsky* v. *New Hampshire*, 315 U.S. 568, 572, 62 S. Ct. 766, 86 L. Ed. 1031 (1942); see also *State* v. *Szymkiewicz*, 237 Conn. 613, 620 n.12, 68 A.2d 473 (1996); *State* v. *Williams*, 205 Conn. 456, 473, 534 A.2d 230 (1987). Moreover, "a properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen, and thus be less likely to respond belligerently to fighting words." (Internal quotation marks omitted.) *State* v. *Williams*, supra, 474 n.7, quoting *Houston* v. *Hill*, 482 U.S. 451, 462, 107 S. Ct. 2502, 96 L. Ed. 2d 398 (1987). "[F]ighting words are intended as provocation, which a police officer should be expected to resist, while a true threat is 'a serious expression of intent to harm' . . . the nature of which does not depend on the particular sensitivities of the listener." (Citation omitted.) *State* v. *DeLoreto*, 265 Conn. 145, 162, 827 A.2d 671 (2003).[15]

"[I]n cases raising First Amendment issues [the United States Supreme Court has] repeatedly held that an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." (Internal quotation marks omitted.) *DiMartino* v. *Richens*, 263 Conn. 639, 662, 822 A.2d 205 (2003).

The trial record reveals that but for the call from Nott, Bergeson would not have attempted to stop the defendant's vehicle and, "[pull] a Taser on [the defendant]," which caused the defendant to reenter his vehicle and close the door while he called the police dispatcher and asked to speak to a police captain, a supervisor, and to report that officers were threatening him.

The trial court dismissed the charge alleging interference with Nott at the CVS parking lot because the defendant did not use "fighting words" in the presence of Nott. The defendant's insults had led Nott to call Sergeant Bergeson for assistance, which led to subsequent events in a causal relationship, when Sergeant Bergeson followed the defendant home. Everything that later occurred was prompted by the defendant's exercise of his constitutionally protected speech. As the prosecutor said in his summation, the defendant at the CVS parking lot created the whole situation himself.

Our Supreme Court in 1987 and the United States Supreme Court since 1942 have repeatedly stated that fighting words may be excluded from the protections

of the first amendment, but we do not have them in this case. See *Chaplinsky* v. *New Hampshire*, supra, 315 U.S. 568; *State* v. *Williams*, supra, 205 Conn. 475.

I believe that the charge requested should have been given as relevant to the defendant's claim to the jury that the defendant's words led to Sergeant Bergeson's actions. I would conclude that the jury should have been instructed, as the defendant sought, that the defendant's words were constitutionally protected speech and were not a valid basis for any offense. The jury should have been informed that Nott had no valid basis to request Sergeant Bergeson stop and issue a summons to the defendant for his words spoken to Colburn. Furthermore, Nott's orders to the defendant to step away or to leave were, in effect, an effort to muzzle him—the very antitheses of the right to freedom of speech. The defendant's words also could not provide a basis for Sergeant Bergeson to stop the defendant and, after finding the defendant outside his vehicle, "pull a Taser on [the defendant]" and violate the defendant's first amendment rights.

As to Sergeant Bergeson acting within the scope of his duties and the good faith belief of Sergeant Bergeson when "pull[ing] a Taser on [the defendant]," consideration of the first amendment was vital to a fair consideration of the interference charge as related to Sergeant Bergeson. See *State* v. *Casanova*, 255 Conn. 581, 590–94, 767 A.2d 1189 (2001). The instruction was necessary so that the jury would be bound to consider that Sergeant Bergeson's actions prejudiced the defendant's right to exercise his first amendment right to free speech to criticize Nott. That criticism, as nonfighting words, was the cause of Sergeant Bergeson's actions and the defendant's reactions that afternoon.

The instruction was also relevant to Sergeant Bergeson's conduct in pointing his Taser at the defendant while the defendant was leaving his van, causing the defendant to return to the van and call the police dispatcher, seeking to speak to a ranking officer about an officer threatening him with his daughter in the van. This call was the defendant's exercise of free speech to memorialize and report police conduct and seek aid in safeguarding his and his daughter's well-being. As such, the defendant's exercise of his rights, by retreating to his van to telephone the police dispatcher to alert senior officers to what was happening, could not support the charge of interfering with Sergeant Bergeson. Under the instructions, it could not support a criminal prosecution constituting a deprivation of his constitutional right to free speech. See *Glik* v. *Cunniffe*, 655 F.3d 78 (1st Cir. 2011); *Smith* v. *Cumming*, 212 F.3d 1332 (11th Cir.), cert. denied, 531 U.S. 978, 121 S. Ct. 426, 148 L. Ed. 2d 435 (2000); *Williamson* v. *Mills*, 65 F.3d 155 (11th Cir. 1995).

The citizen's right to freedom of speech was added

to the United States constitution early on (1791); *McIntrye* v. *Ohio Elections Commission*, 514 U.S. 334, 370, 115 S. Ct. 1511, 131 L. Ed. 2d 426 (1995) (Thomas, J., concurring in the judgment); and was exemplified at a Vermont town meeting in Norman Rockwell's painting of the Four Freedoms. In *Glik* v. *Cunniffe*, supra, 655 F.3d 82, the United States Court of Appeals for the First Circuit described that freedom as a necessary bulwark against state efforts to suppress criticism of public officers.

Arrests that interfere with the dissemination of such information, whether by the press or by a private individual, is a violation of the first amendment. See *United States* v. *Grace*, 461 U.S. 171, 184, 103 S. Ct. 1702, 75 L. Ed. 2d 73 (1983) (Marshall, J., concurring and dissenting). A private individual reporting facts that memorialize deadly police activity on his property and directed at his body and his child while seeking police protection from harm I would hold is protected by the first amendment in this case.

The defendant also filed a request to charge on the defense of entrapment. When presenting this request, defense counsel stated that the record could also support a defense of justification (self-defense) arising from the Taser's deadly threat. The court refused to give that instruction as well.

The entrapment instruction would require proof that the police induced the defendant to commit an offense of interfering with Sergeant Bergeson's effort to arrest the defendant by his locking the vehicle as charged in the information.

The undisputed facts establish that the defendant was following Sergeant Bergeson's direction to leave his vehicle only to be met with the threat of the Taser under the control of an adversary in a civil rights case, in this case, a deadly threat. See footnote 12 of this opinion. The majority concludes Sergeant Bergeson's "pointing" his Taser at the defendant could not induce the defendant to reenter his vehicle and lock the door to call the police dispatcher. I would conclude there was evidence from which the jury could conclude inducement was proven. The evidence was not contested that the "pointing" (as described in the majority opinion) of the Taser resulted in the defendant's call to the police dispatcher from the defendant's van. I would respectfully disagree because this threat would constitute the most serious inducement known.

As to the purpose of inducing the defendant's action to institute a criminal prosecution against the defendant[16] and that the defendant did not contemplate and would not have participated in such conduct, I would point to the circumstantial evidence that Sergeant Bergeson would be seeking such a charge of interference because of the defendant's lawsuit against him, the lack

of a constitutional reason to stop and arrest him because of the first amendment, the fact that the defendant was complying with Sergeant Bergeson's orders to leave the vehicle, only to be confronted with the drawn Taser, and the other factors enumerated above as to the failure to give the freedom of speech instruction.

## PROSECUTORIAL MISCONDUCT AND PREJUDICE

Finally, I dissent as to part IV of the majority opinion, where the prosecutor began his rebuttal jury summation with the statement: "Let me tell you why I think this case warrants conviction," and later ended his summation with the statement: "If I'm going to convict someone, I better well have a good case. And I think we do," which was stricken when the court sustained the defendant's objection and then the prosecutor stated, "Okay."

Between these improper opening and closing statements of personal belief in the state's case, which the prosecutor knew to be improper, the prosecutor improperly asked the jurors to put themselves in the policeman's shoes. The prosecutor also asked the jury to view the facts with the lens of the prosecutor's own reaction when stopped by the police.[17] The prosecutor withdrew this remark when the defendant objected.

The prosecutor also gave his own observations of Officer Bergeson's having denied during his testimony that he punched the defendant in the back. The prosecutor stated to the jury that "[h]e seemed surprised" to be asked, and the prosecutor added, "I don't know. You make the judgment," a remark he repeated when addressing the defendant's claim that the officers caused the defendant's back contusion. The prosecutor also addressed the issue of the Taser by stating: "I mean, I don't really like Tasers myself." Referring to a missing video of the police station booking room where the defendant had complained of his injuries, he stated: "I don't know, but what does it have to do with what the defendant did before?" These latter remarks, at the least, made the prosecutor a witness to his knowledge or lack thereof of signs of ill will against the defendant. Since the remarks were beyond the evidence in the record, they were unsworn testimony, which is not the subject of proper closing argument. "Moreover, when a prosecutor suggests a fact not in evidence, there is a risk that the jury may conclude that [the prosecutor] has independent knowledge of facts that could not be presented to the jury." (Internal quotation marks omitted.) *State* v. *Skakel*, 276 Conn. 633, 746, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006).

The majority, in considering the effect of the summation under *State* v. *Williams*, 204 Conn. 523, 529 A.2d 653 (1987), refers to the state's case as "strong" or not "weak." I disagree as to the engaging the officer in

pursuit charge that required the jury to find the defendant sought by speeding to elude or escape from the police while driving at Wall Street in route directly to his house. It was also contrary to the video camera in Sergeant's Bergeson's cruiser, which showed the defendant's vehicle going directly to the defendant's home at a slow speed, after braking at stop signs and using his turn signal to indicate his future direction at each turn, while being closely followed by Sergeant Bergeson.

As to the interference with Sergeant Bergeson, the evidence is that the defendant only reentered his vehicle and closed the door to call the police headquarters to report events to senior officers and ask for police assistance when being confronted by an officer he was suing, who was pulling a Taser, a dangerous weapon, "on him" after he had left his vehicle as directed by that officer—all of which was not contested.

Accordingly, I respectfully dissent and would order a new trial as to the interference count.

[1] The second amended substitute information, filed during the trial, charged in count two that the defendant "at Wall Street, did increase the speed of the motor vehicle he was driving in an attempt to escape or elude [Sergeant] Bergeson of the New London Police Department when said police officer activated his emergency lights and sirens indicating to the accused to stop, but instead, the accused increased his speed in violation of . . . General Statutes [§] 14-223 (b)."

[2] The majority notes there is no claim the video recordings have been altered in any way. I note as well there is no claim the audio discs have been altered in any way.

[3] See footnote 5 of this opinion.

[4] The amended substitute information restricted the evidence to the defendant's speed at Wall Street. See footnote 1 of this opinion.

[5] Due to the considerable distance between Sergeant Bergeson's cruiser and the defendant's vehicle, the cruiser's video camera did not clearly show the use of a turn signal except to show yellow and red lights on the rear left side of the defendant's vehicle.

[6] The conversation was as follows:

"[Sergeant Bergeson]: I'm trying to stop one Charlie Mike 630 [the defendant's license plate], going up Redden. He's not stopping.

"[Another Officer]: [Inaudible] units to . . . .

"[Sergeant Bergeson]: [Inaudible] He's heading right to his house. I'm gonna turn everything off so it doesn't cause a problem, and then I'm gonna take him into custody."

[7] Sergeant Bergeson testified Nott called him on Redden Avenue to tell Sergeant Bergeson that the defendant's daughter was in the defendant's van. However, the recordings demonstrate that Officer Nott's call was made to Sergeant Bergeson later while Sergeant Bergeson was in the backyard of the defendant's home on Colman Street.

The conversation between Sergeant Bergeson and Nott was as follows:

"[Sergeant Bergeson]: Shut my siren off, please, somebody, before you come in the backyard. That's where I'm at.

"[Nott]: 3 to Lima, just so you know, his child is in the front passenger seat, 3 is in route."

An examination of the time stamps on the audio discs reveals that Sergeant Bergeson received Nott's transmission that a child was in the defendant's van only after the defendant was in his backyard carport.

[8] The defendant requested the following: "The first amendment to the [United States] constitution states in part that state 'shall make no law . . . abridging the freedom of speech.' An expanded right to speech and expression exists under [article first, § 5, of] the Connecticut [c]onstitution, which states that 'No law shall ever be passed to curtail or restrain the liberty of speech or of the press.' *The loss of first amendment freedoms, for even minimal periods of time, unquestionably constitutes a violation of basic*

*rights.* These provisions apply equally to the actions of state and local officials, including police officers and school officials. Moreover, the constitutional right to free speech extends to nearly all words directed toward a police officer, even where those words are angry, annoying or offensive, as long as they don't constitute a true threat to commit violence. Asking someone, 'Is this officer giving you a ticket' offering opinions about the integrity of the officer, or inquiring whether the officer made a threat, are not crimes. They are protected forms of expression. *Asking for a supervisor, such as a captain, is also a protected form of expression.* Insolence and rudeness are not crimes, and enforcing better standards of social conduct is not the business of police officers, or the courts. Due to their training and experience police officers are expected to be more thick-skinned than ordinary citizens, and therefore, the first amendment protects a significant amount of verbal criticism directed at police officers, that might be inappropriate in other contexts.

"In addition to actual words, the first amendment also protects an individual's right to document police conduct by videotaping or taking pictures of their activities, subject to reasonable time, manner and place restrictions. You have heard evidence that [Daniel G. See * footnote of the majority opinion.] took a picture of Officer Nott, which was the subject of Officer Nott's complaint. [Daniel G.'s. See * footnote of the majority opinion.] actions in taking this photograph were also protected by the first amendment." (Emphasis added.)

[9] The audio communication between Nott and Sergeant Bergeson was as follows:

"[Sergeant Bergeson]: Go ahead [inaudible]

"[Nott]: Three to Lima. Three to Lima.

"[Sergeant Bergeson]: Go ahead.

"[Nott]: Come over to CVS for me, please.

"[Sergeant Bergeson]: Okay. Do you need me? I'm just walking into Neal's. I'll head over there.

"[Another Officer]: Three—Is it something Sierra can take care of or . . ?

"[Sergeant Bergeson]: Yup, I know what it is. I'll be right over.

"[Nott]: If you can, hit a motor vehicle stop on it and maybe give him a ticket for interfering or creating a disturbance.

"[Sergeant Bergeson]: Yeah. He's taking off right now. What happened?

"[Nott]: He's been following me, and, uh, taking my picture and then asking the people that are involved in the accident, um, if I'm giving them a ticket, so forth and so on."

[10] In its brief, the state admits that on Jefferson Street the defendant was "considerably ahead" of Sergeant Bergeson.

[11] A Taser is a type of controlled electronic weapon capable of firing wires tipped with a pair of barbed darts to deliver a paralyzing electric charge. *Bryan* v. *MacPherson*, 630 F.3d 805, 824 (9th Cir. 2010). A police Taser, which is capable of causing death or serious injury, may meet the definition of a dangerous instrument under General Statutes § 53-206 and § 53a-3 (7).

[12] Some recent medical studies have concluded that the electrical shock delivered by a Taser could cause death by cardiac arrest. See, e.g., D. Zipes, MD, "Sudden Cardiac Arrest and Death Following Application of Shocks From a TASER Electronic Control Device," Circulation Journal of the American Heart Association (2012).

Recent Connecticut deaths following Taser use have prompted citizen groups to call for legislation to regulate the use of Tasers. See G. Merritt, The CT Mirror, "Taser death spurs calls for more regulation," (September 4, 2013), available at http://www.ctmirror.org/story/2013/09/04/taser-death-spurs-calls-more-regulation (copy contained in the file of this case in the Appellate Court clerk's office) (noting thirteen Connecticut deaths following Taser use since 2005).

[13] The radio transmission is transcribed as follows:

"[Another Officer 1]: 2 to something to report 132.

"[Sergeant Bergeson]: Q, uh, he . . locked himself in the car, I guess.

"[Another Officer 1]: Alrighty. What's your location?

"[Sergeant Bergeson]: 95 [Colman]. I'll take him out and Taser him if I have to.

"[Another Officer 1]: We weren't able to copy that location. Did anybody get it?

"[Another Officer 2]: 4 [inaudible].

"[Another Officer 2]: 4 is almost out [inaudible].

"[Sergeant Bergeson]: Sierra is out.

"[Another Officer 1]: Roger."

[14] The defendant's telephone call to the police dispatcher is transcribed as follows:

"[The Defendant]: . . . . Just threatened my life.

"[Police Dispatcher]: Communications.

"[The Defendant]: Yes, may I speak to the captain or whoever's on duty?

"[Police Dispatcher]: I beg your pardon?

"[The Defendant]: I need to speak to the captain or lieutenant on duty please. . .

"[Police Dispatcher]: What's your name?

"[The Defendant]: My name is [Daniel G. See * footnote of the majority opinion.] I'm being threatened by officers right now and my daughter. They are threatening us both.

"[Police Dispatcher]: [OK, sir]. I'm going to ask you to comply with the officers. Okay. And do what they tell you to do.

"[The Defendant]: I wanna speak to the captain, okay?

"[Police Dispatcher]: Sir, sir. There is a lieutenant on scene there.

"[The Defendant]: There is? Which lieutenant?

"[Police Dispatcher]: [Lieutenant] Bergeson is there. Well he's acting [Lieutenant] Bergeson . . . ."

[15] A true threat is another unprotected form of speech. See *State* v. *Moulton*, 310 Conn. 337, 349, 78 A.3d 55 (2013).

[16] Inducing the defendant's action for the purpose of instituting a criminal prosecution against him would not have been required for a justification defense.

[17] The prosecutor described such a stop as one to be seen in the "rearview mirror" where the police flashing lights were directly behind the operator.