******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# STATE OF CONNECTICUT *v.* AUSTIN GRANT HAUGHWOUT
## (SC 20547)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

The defendant was convicted of one count of interfering with an officer, one count of disobeying the direction of an officer while increasing the speed of a motor vehicle in an attempt to escape or elude, and two counts of assault of a peace officer in connection with two separate incidents between him and certain police officers. During the first incident, an officer, S, turned his cruiser into a parking lot adjacent to a library at about 9 p.m. S observed the defendant walking quickly from a picnic table near the library to a parked vehicle in the lot. Once in the vehicle, the defendant took a few moments to set up a dashboard camera in order to record the incident. Shortly thereafter, the defendant drove his vehicle toward the exit, S turned his cruiser's light bar on briefly, and S motioned with his hand for the defendant to pull alongside the cruiser, which he did. After a brief dialogue, S told the defendant to put his vehicle in park. The defendant ignored S's command and abrubtly began to drive toward the exit. S turned on his lightbar again and pulled his cruiser behind the defendant's vehicle. The defendant stopped, shouted to S, "hey asshole," and then proceeded to exit the parking lot and to drive north on a local road. Another officer, who had just arrived at the scene, and S pursued the defendant, and the defendant stopped a short distance up the road. After the defendant continued to argue with the officers and declined a request to provide his operator's license and registration, the officers let him leave the scene and applied for an arrest warrant. The second incident occurred when the defendant, in response to being informed by the police that they had obtained a warrant for his arrest, arrived at the police station. The defendant brought a video camera with him and began recording. The defendant was told by an officer, V, that he was in custody and under arrest. V also told the defendant that he had to secure the camera and that it would be returned. The defendant declined to surrender the camera and attempted to leave. A struggle between the defendant and V ensued, shortly after which another officer, D, came to V's assistance. Once the defendant was subdued, he was carried to the booking area. Before trial, the defendant moved to suppress evidence derived from the encounter relating to the first incident, claiming that S lacked a reasonable and articulable suspicion that the defendant had been engaged in criminal activity and that his detention was therefore illegal. The trial court denied that motion. On appeal from the judgments of conviction, the defendant claimed, inter alia, that the trial court improperly denied his motion to suppress and that the evidence was insufficient to support his conviction of both counts of assault of a peace officer. *Held*:

1. The trial court improperly denied the defendant's motion to suppress evidence relating to the first incident, as the defendant's detention by S in connection with that incident was unlawful, and, accordingly, the judgment of conviction of interfering with an officer and disobeying the direction of an officer was reversed; the defendant's conduct could not, in and of itself, give rise to a reasonable and articulable suspicion of criminal activity, as the totality of circumstances did not objectively indicate that the defendant was attempting to elude detection, there were no signs limiting access to the parking lot, members of the public frequently used the area after the library was closed in order to use the book drop and to access the library's free Wi-Fi, the fact that crimes previously occurred nearby did not alter this conclusion, and S's observation that the defendant walked quickly toward his vehicle fell short of the type of flight that has been found to indicate criminal behavior.

2. There was no merit to the defendant's claim that there was insufficient evidence to support his conviction of both counts of assault of a peace officer in connection with the second incident on the ground that the

jury could not have reasonably found that the defendant had intended to interfere with the performance of either V's or D's duties or to cause D's injuries, and on the ground that the evidence did not support a finding that V's use of force was reasonable: the context afforded by the argument preceding the struggle at the police station, the defendant's attempt to leave the lobby, the fact that he kicked V multiple times, and the length of the struggle were facts from which the jury reasonably could have inferred that the defendant's resistance was undertaken with an intent to delay his arrest, and not the result of mere reflex; moreover, the evidence was sufficient to support the conclusion that V's use of force was reasonable, as V testified that he grabbed the defendant, who had been informed that he was under arrest, in order to prevent him from leaving the lobby and brought him to the ground only after the defendant began to struggle, V was outsized and alone at the moment the struggle began, and V never struck the defendant or resorted to the use of any type of weapon; furthermore, the jury could have reasonably concluded that the defendant injured D during the struggle, as D testified that he experienced neck and back pain as a result of the defendant's resistance and that he took time off from work to recover from those injuries.

3. The defendant was entitled to a new trial with respect to the count charging him with the assault of V, as the trial court improperly declined to instruct the jury that, to find the defendant guilty of that assault, it must first determine that V's use of force was reasonable, and, accordingly, the defendant was entitled to a new trial with respect to that count; nevertheless, the defendant could not prevail on his claim that the trial court committed reversible error by failing to instruct the jury, with respect to the charge relating to the assault of D, that the defendant's conduct must have been the proximate cause of D's injuries, as the trial court's instruction on causation was both legally correct and adequate when viewed in the context of the evidence presented at trial.

Argued February 24—officially released July 23, 2021*

*Procedural History*

Substitute information, in the first case, charging the defendant with the crimes of disobeying the direction of an officer while increasing the speed of a motor vehicle in an attempt to escape or elude an officer and interfering with an officer, and substitute information, in the second case, charging the defendant with two counts of the crime of assault of public safety personnel and one count of the crime of interfering with an officer, brought to the Superior Court in the judicial district of Middlesex, where the cases were consolidated and tried to the jury before *Suarez, J.*; thereafter, the court, *Suarez, J.*, denied the defendant's motion to suppress certain evidence; subsequently, verdicts of guilty; thereafter, the court, *Suarez, J.*, vacated the conviction of interfering with an officer in the second case and rendered judgments of conviction on the remaining counts in both cases, from which the defendant appealed. *Affirmed in part; reversed in part; judgment directed in part; further proceedings.*

*Jennifer Bourn*, supervisory assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Michael A. Gailor*, state's attorney, and *Russell C. Zentner*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KAHN, J. The defendant, Austin Grant Haughwout, appeals from judgments of conviction on charges arising from, respectively, two separate incidents between him and various officers of the Clinton Police Department in July, 2015. The defendant claims that evidence of certain events during the first incident, which occurred in the parking lot of a local library on the night of July 19, 2015, should have been suppressed because those events were the result of an unconstitutional investigatory detention. The state responds to this claim by arguing that, in light of the totality of the circumstances presented, the police had a reasonable and articulable suspicion that the defendant had been engaged in criminal activity and that an investigatory detention was, therefore, constitutional under *Terry* v. *Ohio*, 392 U.S. 1, 21–22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).[1] We disagree with the state and, accordingly, reverse the trial court's judgment of conviction as to the offenses relating to the incident that occurred on July 19, 2015. The defendant also claims that his conviction of two counts of assault of public safety personnel, specifically a peace officer, related to the second incident, which occurred inside of the Clinton Police Department on July 22, 2015, is infirm because (1) the state's evidence was insufficient to support his conviction, and (2) the trial court erred when instructing the jury. The state concedes that a new trial is required with respect to one of the assault charges due to instructional error but contends that the defendant's remaining claims lack merit. We agree with the state and, therefore, affirm in part and reverse in part the trial court's judgment of conviction related to the incident that occurred on July 22, 2015.

The following facts and procedural history are relevant to our consideration of the present appeal. Shortly after 9 p.m. on the evening of July 19, 2015, Officer Alexieff Adrian Santiago drove past the Henry Carter Hull Library in the town of Clinton and observed a vehicle parked in an unlit corner of an adjacent parking lot.[2] Although the library had closed earlier that day, Santiago testified that the public frequented the parking lot after hours to use the book drop and to access the library's free Wi-Fi.[3] Santiago turned his police cruiser around, drove into the parking lot, and observed a person walking "quickly" in the direction of the parked vehicle.[4] A few moments later, that vehicle began to drive toward the exit of the parking lot.[5] Santiago turned his cruiser's light bar on briefly and then motioned with his hand for the approaching vehicle to pull alongside of his cruiser. Santiago immediately recognized the defendant and asked him what he had been doing there. The defendant responded that he had been using the library's Wi-Fi at a picnic table adjacent to the parking lot but had left because he was being bothered by bugs.[6]

Santiago then decided to look behind the library and ordered the defendant to put his vehicle in park. The defendant then began to ask, repeatedly and continuously, whether Santiago suspected him of a crime. Santiago responded by telling the defendant, at least two more times, to put the vehicle in park. The defendant ignored those commands and abruptly began to drive toward the exit of the parking lot. While Santiago was turning his cruiser around to pursue the defendant, he noticed that a fence gate leading to a patio behind the library was open.[7] Santiago then turned on his light bar, pulled his cruiser up behind the defendant at the exit of the parking lot, and radioed for backup. The defendant stopped his vehicle, called out to Santiago by exclaiming, "hey asshole," and then continued to shout out of the window. As another officer arrived, the defendant pulled out of the parking lot and began to drive north on Killingworth Turnpike. The officers engaged their sirens and followed. Although the defendant came to a halt a short distance away, he thereafter continuously argued with the officers, refused to put the transmission of his vehicle into park, and repeatedly declined to provide his license and registration when requested. The police officers ultimately decided to let the defendant leave the scene and to apply for an arrest warrant based on his conduct.

On July 22, 2015, the police called the defendant and informed him that they had obtained a warrant for his arrest in connection with the preceding events. The defendant arrived at the police station at approximately 8 p.m. that evening. Prior to entering the police station, the defendant, using a small video camera, began a recording of the event by noting the date, time, location, and purpose of his visit and reviewing an inventory of items he was taking with him into the station. After entering the station, he was explicitly told by Officer Christopher Varone that he was in police custody and under arrest. At that time, Varone noticed that the defendant was carrying a small video camera and stated that, for safety reasons, it would not be allowed into the booking area. At least twice, Varone patiently stated that he would secure the device and return it after the defendant was released on a promise to appear. Varone repeatedly indicated that, if the defendant did not comply, he would soon be forced to do so. During the course of this discussion, the defendant declined to give up the camera several times. At first, the defendant asserted that he needed to keep the camera for his own safety but then later stated that he was just going to leave the camera in the lobby. The defendant then walked a short distance away and placed his camera down on top of a display case. Varone told the defendant that the police department would not be responsible for the camera if the defendant chose to leave it in the lobby. Shortly thereafter, the defendant picked his camera back up and turned to leave the station, stating

that he was going to secure the camera himself.

Varone grabbed the defendant in order to prevent him from leaving the station, the defendant resisted, and a struggle ensued. Varone forced the defendant to the floor while the defendant began kicking Varone repeatedly. Moments later, Officer James DePietro, Jr., ran into the lobby and joined the struggle in order to assist Varone. DePietro audibly ordered the defendant, who was still "flailing about," "kicking," and "struggling" at the time, to put his hands behind his back. The defendant refused to comply and was eventually restrained. The defendant then repeatedly ignored commands to get up off of the floor and walk on his own into the booking area. As a result, he was carried to the booking area with the assistance of additional officers.

The jury's understanding of the events in the lobby that day was informed by no less than three separate recordings: (1) a video from the camera in the defendant's hand, which had audio; (2) a video from a security camera in the lobby, which did not; and (3) an audio recording from a cell phone hidden inside of the defendant's pants. The defendant's camera was turned off shortly after DePietro joined the struggle in the lobby. The cell phone hidden in the defendant's pants recorded audio for the duration of the relevant events that day. The security camera recorded most of the events in the lobby, but was positioned at an angle that did not capture the portion of the incident that occurred after the defendant was on the floor. In addition, the evidence also included recordings from a camera in the booking area's cell block, which contain both video and audio, that show the defendant after he was carried out of the lobby.

Testimony offered at trial indicated that the defendant was about six feet tall and weighed approximately 160 pounds. Varone and DePietro were both physically smaller than the defendant. DePietro generally described the confrontation to the jury as follows: "It . . . just wasn't, you know, going to the ground and putting handcuffs on [the defendant]. It was a fight, a full on fight. And he's a little bigger than I am. But, even with . . . Varone and I, it was a full on fight." The defendant was eventually transported to a hospital by ambulance and then he was released back into the custody of the police. He was then taken back to the police station and processed without further incident.

Both Varone and DePietro sustained minor injuries that day. Specifically, Varone testified that the defendant had kicked him in the chest, face, and arm. Varone indicated that he experienced pain as a result of the kick to his arm, and a photograph was admitted into evidence showing light red bruising on the inside of his left bicep. Varone also testified that he injured one of his fingers while struggling with the defendant and that it went numb for a period of time. DePietro testified

that his neck and back were "very sore from the fight" and that he ended up taking time off from work as a result.

The defendant was subsequently charged with various offenses for his conduct on both July 19 and July 22, 2015. Specifically, with respect to the incident that started in the library parking lot, the defendant was charged with interfering with an officer in violation of General Statutes § 53a-167a (a) and disobeying the direction of an officer while increasing the speed of a motor vehicle in an attempt to escape or elude in violation of General Statutes § 14-223 (b). With respect to the altercation at the police department, the defendant was charged with two counts of assault of a peace officer in violation of General Statutes § 53a-167c (a), relating to Varone and DePietro, respectively, and an additional count of interfering with an officer in violation of § 53a-167a (a), which related only to DePietro.

The two informations were consolidated for trial, and the jury returned verdicts finding the defendant guilty on all counts. The trial court vacated the defendant's conviction as to the interfering charge in the second case on double jeopardy grounds. The trial court imposed separate sentences of one year of incarceration, execution suspended, and one year of probation in connection with both of the charges in the first case. As to each count alleging assault of a peace officer in the second case, the trial court imposed a sentence of seven years of incarceration, execution suspended after one year, and five years of probation. The trial court specified that all four of the sentences were to run concurrently for a total effective sentence of seven years of incarceration, execution suspended after one year, and five years of probation. This appeal followed.[8] Additional facts and procedural history will be set forth as necessary.

In the present appeal, the defendant claims that (1) evidence of his conduct on the evening of July 19, 2015, should have been suppressed by the trial court because it was obtained as a result of an unconstitutional investigatory detention by the police, and (2) the judgment of conviction arising out of the events that occurred at the police station on July 22, 2015, should be reversed because of insufficient evidence and instructional error. We address these claims in turn.

I

We begin with the defendant's claim that the trial court improperly denied his motion to suppress evidence relating to the events of July 19, 2015. In support of this claim, the defendant argues that Santiago lacked a reasonable and articulable suspicion that he had been engaged in criminal activity. The state expressly conceded at oral argument before this court that a reasonable person in the defendant's position would have

believed that he was not free to leave the parking lot once Santiago motioned for the defendant's vehicle to pull alongside of his cruiser and that, as a result, a seizure had occurred within the meaning of our state constitution. See, e.g., *State* v. *Oquendo*, 223 Conn. 635, 653, 613 A.2d 1300 (1992). The state further conceded at oral argument that, if this court were to conclude that the trial court erroneously denied the motion to suppress, that conclusion would be dispositive with respect to the conviction relating to the events of July 19, 2015. However, the state claims that the investigatory detention of the defendant was reasonable in light of the totality of the circumstances known to Santiago at the time. For the reasons that follow, we disagree with the state.

The following additional facts and procedural history are relevant to our consideration of this issue. Before trial, the defendant moved to suppress "any and all evidence, including electronic audio and video recordings, and any statements obtained from the defendant, that [derived from the] unlawful and unconstitutional seizure on July 19, 2015." In support of that motion, defense counsel argued that Santiago lacked a reasonable and articulable suspicion that the defendant had been engaged in criminal activity that evening. In response, the prosecutor argued that the defendant's presence in the parking lot, his movements after Santiago arrived, the explanation he subsequently gave for his presence, and the history of criminal activity in the area were sufficient to permit an investigative detention.

The trial court ultimately denied the defendant's motion to suppress, concluding, inter alia, that Santiago's initial orders were supported by a reasonable and articulable suspicion. In reaching this conclusion, the trial court reasoned: "Santiago saw a vehicle, it was in a dark area of the public library, and after hours, saw an individual getting into the car. Based on his beliefs of prior criminal activity in that area, based on his knowledge as a police officer that criminal activity occurred at the . . . [mall] next door, he had a suspicion, a reasonable and [articulable] suspicion to approach the car and [ask the defendant] some questions."

"Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Davis*, 331 Conn. 239, 246, 203 A.3d 1233 (2019). The question of whether a

particular set of facts gives rise to a reasonable and articulable suspicion is a question of law over which we exercise plenary review. Id., 246–47.

"Under the fourth amendment to the United States [c]onstitution and article first, §§ 7 and 9, of our state constitution, a police officer is permitted in appropriate circumstances and in an appropriate manner to detain an individual for investigative purposes if the officer believes, based on a reasonable and articulable suspicion that the individual is engaged in criminal activity, even if there is no probable cause to make an arrest. . . . Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion. . . .

"[I]n justifying [a] particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant that intrusion. . . . In determining whether a detention is justified in a given case, a court must consider if, relying on the whole picture, the detaining officers had a particularized and objective basis for suspecting the particular person stopped of criminal activity. When reviewing the legality of a stop, a court must examine the specific information available to the police officer at the time of the initial intrusion and any rational inferences to be derived therefrom." (Citations omitted; internal quotation marks omitted.) *State* v. *Clark*, 297 Conn. 1, 9–10, 997 A.2d 461 (2010).

Our analysis in the present case is guided in particular by this court's decision in *State* v. *Santos*, 267 Conn. 495, 838 A.2d 981 (2004). In that case, police officers reported seeing four men pacing nervously back and forth in a dark parking lot at night and stated that one of them smelled of alcohol. Id., 505–506. Several municipal athletic fields adjacent to that parking lot remained open to the public after sunset, but the area was routinely patrolled at night because of previous criminal activity involving both drugs and prostitution. Id., 498. When questioned, the group of men told the police that they were " 'just driving around' " and that they had been wrestling with each other on the ground before the police arrived. Id., 499–500.

Although we acknowledged that the time of day and the history of criminal activity in an area can be relevant factors to consider in the course of such an analysis, we concluded that those factors alone were insufficient to create a reasonable suspicion that the defendant had been committing a crime. Id., 508–509, citing *Brown* v. *Texas*, 443 U.S. 47, 52, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979) ("[t]he fact that [the defendant] was in a neighborhood frequented by drug users, standing alone,

is not a basis for concluding that [the defendant] himself was engaged in criminal conduct"); see also *State* v. *Scully*, 195 Conn. 668, 679 n.15, 490 A.2d 984 (1985) ("[t]he lesson from *Brown* . . . is simply that physical presence in a geographical area where the police may have reason to anticipate possible violations of the law does not in and of itself justify arbitrary investigatory stops").

Our decision in *State* v. *Donahue*, 251 Conn. 636, 742 A.2d 775 (1999), cert. denied, 531 U.S. 924, 121 S. Ct. 299, 148 L. Ed. 2d 240 (2000), reached the same conclusion. In that case, the state argued that the police had reasonable suspicion to detain a defendant after his vehicle made an abrupt, but legal, turn into an unlit parking lot at 1:50 a.m. Id., 639–41, 647. As in *Santos*, the state relied on testimony demonstrating that the social club next to that parking lot had already closed for the evening and that the surrounding area had recently experienced a rise in criminal activity. Id., 639, 641. The trial court in *Donahue* declined to suppress the evidence that was discovered as a result of that detention, concluding that "there's a reasonable and articulable suspicion that criminal activity was afoot when given the vicinity, the time of night the defendant pulls into the dirt parking lot of a club that is closed. And there's no other businesses in the area that could have been opened at that time. So I find that there was [a] reasonable suspicion to justify the stop at that time." (Internal quotation marks omitted.) Id., 641. This court reversed the judgment of the Appellate Court, which affirmed the trial court's judgment, concluding that the defendant's detention "was based on nothing more than the location of the defendant's vehicle at an early hour of the morning." Id., 637, 645. In reaching that conclusion, we noted that the defendant had committed no traffic violations, had not engaged in furtive conduct of any kind, and that the vehicle was unconnected to any ongoing police investigations. Id., 647.

The reasoning of both *Santos* and *Donahue* compels the conclusion that the defendant's mere use of the library's parking lot and picnic table at 9 p.m. on a Sunday evening cannot, in and of itself, give rise to a reasonable and articulable suspicion of criminal activity. See, e.g., *State* v. *Edmonds*, 323 Conn. 34, 68, 145 A.3d 861 (2016) ("[i]t is well established that the fact that a citizen chooses to stand outside at the dinner hour, in a neighborhood plagued by crime, does not warrant any reasonable and articulable suspicion that he himself is engaged in criminal activity"). As previously stated in this opinion, there were no signs limiting access to the parking lot, and members of the public frequently used the area after the library was closed. The fact that crimes had previously occurred nearby; see footnote 2 of this opinion; does not alter this conclusion. See, e.g., *State* v. *Oquendo*, 223 Conn. 635, 655 n.11, 613 A.2d 1300 (1992) ("[a] history of past

criminal activity in a locality does not justify suspension of the constitutional rights of everyone, or anyone, who may subsequently be in that locality" (internal quotation marks omitted)).

The additional facts relied on by the state to demonstrate the existence of a reasonable and articulable suspicion are insufficient to warrant a different result. First, Santiago's observation that the defendant was walking quickly toward his vehicle is of limited value. Even if that movement was occasioned by Santiago's arrival, a point that is neither specifically resolved by the trial court's factual findings nor entirely clear from the record, it would still fall short of the type of headlong flight that has been found to be indicative of criminal behavior in other contexts. See, e.g., *State* v. *Edmonds*, supra, 323 Conn. 72–73 ("[t]he mere fact that a citizen turns and walks away from an approaching police officer does not . . . support a reasonable and articulable suspicion of criminality" (emphasis omitted)); cf. *Illinois* v. *Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000). The totality of the circumstances presented in this case also do not objectively indicate that the defendant was attempting to elude detection. Cf. *State* v. *Wilkins*, 240 Conn. 489, 493, 692 A.2d 1233 (1997) (ducking down in car to avoid being seen by police); *State* v. *Januszewski*, 182 Conn. 142, 144–45, 438 A.2d 679 (1980) (avoiding police by crawling out of passenger door of vehicle and under adjacent motorcycle) (overruled in part on other grounds by *State* v. *Hart*, 221 Conn. 595, 609, 605 A.2d 1366 (1992)), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981); *State* v. *Watson*, 165 Conn. 577, 581, 585–86, 345 A.2d 532 (1973) (four individuals exiting vehicle behind closed restaurant and, minutes later, hurrying out from behind adjacent establishment to reenter same vehicle), cert. denied, 416 U.S. 960, 94 S. Ct. 1977, 40 L. Ed. 2d 311 (1974). Indeed, after returning to his vehicle, the defendant sat, stationary, for several moments in order to set up his dashboard camera and then promptly brought his vehicle to a stop when signaled to do so by Santiago.

Santiago's initial reaction to the defendant's explanation that he had been using the library's Wi-Fi also does little to support the state's position given that Santiago himself recognized that members of the public frequently used the parking lot after hours for that exact purpose. Further, Santiago acknowledged that the Wi-Fi signal could well have been strong enough at the picnic tables for at least some purposes.[9] In light of these facts, we see no reason to conclude that the defendant's explanation for his presence was any more suspicious than the ones given to the police in *Santos*.[10]

In sum, Santiago's suspicion appears to have been based principally on the fact that the defendant happened to be present in the library parking lot at night

and began to leave when Santiago arrived. Our precedent firmly establishes that such factors are, without more, insufficient to support a reasonable and articulable suspicion that criminal activity was afoot. Consequently, we conclude that the defendant's detention was unlawful and that, as a result, the trial court improperly denied his motion to suppress. The state has conceded, for the purpose of the present appeal, that this conclusion forecloses the imposition of criminal liability for the conduct that followed during the investigatory stop on July 19, 2015. The judgment of conviction as to the charges of interfering with and disobeying an officer related to that conduct, therefore, cannot stand.

## II

The defendant's remaining claims of error relate to the two counts of the information in the second case alleging assault of a peace officer, which concerned the confrontation between the defendant, Varone, and DePietro that occurred at the Clinton Police Department on July 22, 2015.[11] The defendant argues that there was insufficient evidence to support either of those charges and that the trial court improperly declined to instruct the jury as to both counts. For the reasons that follow, with the exception of the claim of instructional error as to the assault count relating to Varone, we reject these claims.

## A

### Sufficiency Claims

The defendant raises three distinct claims relating to the sufficiency of the state's evidence. First, the defendant argues that he is entitled to a judgment of acquittal on both of the assault charges in the second case because the jury, based on the evidence presented at trial, could not have reasonably found that the defendant intended to interfere with the performance of either Varone's or DePietro's duties. Second, the defendant claims that his conviction for assaulting Varone must, likewise, be reversed because there was insufficient evidence to show that Varone's use of force was reasonable.[12] Finally, the defendant claims that his conviction for assaulting DePietro must be reversed because the jury could not have reasonably concluded that he had caused DePietro's injuries. The state disagrees with each of these claims, arguing that the various video recordings of the event and the testimony offered by the two officers at trial were sufficient to support the defendant's conviction. We agree with the state and conclude that the defendant's sufficiency claims lack merit.

The relevant standard of review is well established. "When reviewing a sufficiency of the evidence claim, we do not attempt to weigh the credibility of the evidence offered at trial, nor do we purport to substitute our judgment for that of the jury. . . . [W]e construe the

evidence in the light most favorable to sustaining the verdict . . . . We then determine whether the jury reasonably could have concluded that the evidence established the defendant's guilt beyond a reasonable doubt. . . . [W]e do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *Lamantia*, 336 Conn. 747, 755, 250 A.3d 648 (2020); see also *State* v. *Ford*, 230 Conn. 686, 693, 646 A.2d 147 (1994) ("[w]e do not sit as the 'seventh juror' when we review the sufficiency of the evidence"). "A party challenging the validity of the jury's verdict on grounds that there was insufficient evidence to support such a result carries a difficult burden." (Internal quotation marks omitted.) *State* v. *Rhodes*, 335 Conn. 226, 233, 249 A.3d 683 (2020).

In order to prove a violation of § 53a-167c (a) (1), the state must establish that the defendant "(1) inten[ded] to prevent (2) a reasonably identifiable officer (3) from performing his duty (4) by causing physical injury to such officer . . . ." *State* v. *Flynn*, 14 Conn. App. 10, 21, 539 A.2d 1005, cert. denied, 488 U.S. 891, 109 S. Ct. 226, 102 L. Ed. 2d 217 (1988); see also *State* v. *Casanova*, 255 Conn. 581, 592, 767 A.2d 1189 (2001), overruled in part on other grounds by *State* v. *Brocuglio*, 264 Conn. 778, 826 A.2d 145 (2003). "If [a] police officer does not reasonably believe that his use of physical force is necessary, then his use of force is not within the performance of his duties and a citizen may properly resist that use of force." *State* v. *Davis*, 261 Conn. 553, 570–71, 804 A.2d 781 (2002).

The defendant first claims that no jury could reasonably conclude that he possessed an intent to prevent Varone and DePietro from performing their duties. Specifically, the defendant contends that the evidence presented at trial could reasonably support a finding only that he had panicked and lost control.[13] We disagree. The context afforded by the argument preceding the fight, the defendant's attempt to leave the lobby, the number of times he kicked Varone, and the overall length of the struggle that followed are all facts from which the jury could have reasonably inferred that the defendant's resistance was undertaken with an intent to delay his own arrest and not mere reflex. See, e.g., *State* v. *Porter*, 76 Conn. App. 477, 490–91, 819 A.2d 909 (sufficient evidence of intent to interfere with duties of officer in case in which defendant responded to attempted arrest by struggling with officer and striking him in face and shoulder) (overruled in part on other grounds by *State* v. *Polanco*, 308 Conn. 242, 61 A.3d 1084 (2013)), cert. denied, 264 Conn. 910, 826 A.2d 181 (2003).

The defendant's next claim is that the evidence admitted at trial was insufficient to support a conclusion

that Varone's use of force was reasonable. Again, we disagree. Varone testified that he initially grabbed the defendant in order to prevent him from leaving the lobby and that he brought the defendant to the ground only after the defendant began to struggle in response.[14] The police had obtained an arrest warrant for the defendant, and, as stated previously in this opinion, Varone had already told the defendant multiple times that he was under arrest and in the custody of the police. Varone repeatedly offered to secure the camera for the defendant and to return it to him after he was processed and released on a promise to appear. At the moment the struggle began, Varone was outsized and alone. The testimony and exhibits offered at trial indicate that Varone never struck the defendant or resorted to the use of any type of weapon. These facts, although perhaps not conclusive, would have been sufficient to allow a properly instructed jury to conclude that Varone's decision to physically prevent the defendant from leaving the lobby and his decision to bring the defendant to the ground during the course of the struggle that followed were both reasonable when considered in context.

The defendant's final sufficiency claim is that the jury could not have reasonably concluded that he caused injuries to DePietro. This argument is adequately disposed of by DePietro's testimony that he experienced neck and back pain as a direct result of the defendant's resistance and that he took time off from work to recover from that injury.[15] See General Statutes § 53a-3 (3) (" '[p]hysical injury' means impairment of physical condition or pain"); *State* v. *Cruz*, 71 Conn. App. 190, 214–15, 800 A.2d 1243 (concluding that definition of physical injury under § 53a-3 (3) applies to charge of assault of peace officer under General Statutes (Rev. to 1997) § 53a-167c), cert. denied, 261 Conn. 934, 806 A.2d 1067 (2002); see also Commission to Revise the Criminal Statutes, Penal Code Comments, Conn. Gen. Stat. Ann. § 53a-3 (West 2007), commission comment (noting that statutory definition of physical injury is "intentionally broad"). Neither the absence of an observable physical condition nor the delayed onset of pain requires the conclusion that the state's evidence was insufficient to support the defendant's conviction.[16] See, e.g., *State* v. *Downey*, 69 Conn. App. 213, 217, 796 A.2d 570 (2002) (pain caused by kick to officer's leg was sufficient to support conviction); *State* v. *Mims*, 61 Conn. App. 406, 408–409 and n.2, 764 A.2d 222 (pain caused by kick to officer's left testicle was sufficient to support conviction notwithstanding fact that injured officer sought no medical attention and took no time off from work), cert. denied, 255 Conn. 944, 769 A.2d 60 (2001); *State* v. *Henderson*, 37 Conn. App. 733, 743–44, 658 A.2d 585 (testimony that victim experienced pain after being struck by defendant in her chest was sufficient evidence of physical injury to support convic-

tion of third degree assault), cert. denied, 234 Conn. 912, 660 A.2d 355 (1995).

## B

### Instructional Error Claims

The defendant raises two separate claims of instructional error. First, with respect to the charge relating to the assault on Varone, the defendant claims that the trial court erred in failing to instruct the jury that, in order to find him guilty of that offense, it must first determine that Varone's use of force was reasonable. Second, with respect to the charge relating to the assault on DePietro, the defendant claims that the trial court improperly declined to instruct the jury that the defendant's conduct must have been the proximate cause of DePietro's injuries. We set forth the relevant standard of review and then address the defendant's two claims in turn.

"The standard of review for claims of instructional impropriety is well established. [I]ndividual jury instructions should not be judged in artificial isolation . . . but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury. . . . A challenge to the validity of jury instructions presents a question of law over which [we have] plenary review." (Internal quotation marks omitted.) *State* v. *Campbell*, 328 Conn. 444, 528–29, 180 A.3d 882 (2018).

We begin with the first claim of instructional error, relating to the count of assault on Varone. On February 23, 2021, this court issued an order granting the defendant permission to file a supplemental brief addressing this additional claim of instructional error. In his supplemental brief filed pursuant to that order, the defendant claimed that the trial court improperly declined his request to instruct the jury as to whether it found that Varone's use of force was reasonable. See, e.g., *State* v. *Davis*, 261 Conn. 553, 570–71, 804 A.2d 781 (2002) ("If [a] police officer does not reasonably believe that his use of physical force is necessary, then his use of force is not within the performance of his duties and a citizen may properly resist that use of force. . . . [A]

detailed instruction that the state must establish that the police officer had been acting in the performance of his duty and that a person is not required to submit to the unlawful use of physical force during the course of an arrest, whether the arrest itself is legal or illegal, stands in lieu of a self-defense instruction in such cases. . . . [T]he failure to provide such instructions when the defendant has presented evidence, no matter how weak or incredible, that the police officer was not acting in the performance of his duty, effectively operates to deprive a defendant of his due process right to present a defense."). The state, in response, concedes that the trial court committed reversible error by omitting the requested instruction. Having reviewed the record, we agree with the parties and conclude that, as a result, the defendant is entitled to a new trial with respect to the assault on Varone charged in the first count of the information in the second case.

The defendant's second claim of instructional error relates to the charge arising out of the assault on DePietro. In particular, the defendant claims that the trial court committed reversible error by failing to specifically instruct the jury that, in order to find the defendant guilty of assault of a peace officer, as alleged in the second count of the information in the second case, the defendant's conduct must have been the proximate cause of DePietro's injuries. The state responds by arguing that the instruction given by the trial court on the topic of causation was both legally correct and adequate when viewed in the context of the evidence presented at trial. For the reasons that follow, we agree with the state.

The following additional procedural history is relevant to our consideration of this issue. The defendant submitted a request to charge on the counts of the information in the second case alleging assault of a peace officer. That proposed instruction indicated that the state bore the burden of demonstrating not only that the defendant's conduct caused the injuries to DePietro's neck and back, but also that the defendant's conduct "was the proximate cause" of those injuries.[17] The trial court declined that request.

The trial court ultimately provided the following general instruction with respect to the first two counts of the information in the second case: "[A] person is guilty of assault of a peace officer when, with intent to prevent a reasonably identifiable peace officer from performing his duties and while such said peace officer was acting in the performance of his duties, such person caused physical injury to the peace officer." In a series of more specific instructions that followed, the trial court expressly informed the jury that the state bore the burden of proving that (1) "the defendant . . . caused physical injury to [DePietro]," and (2) the conduct specifically intended to prevent the performance of

DePietro's duties must have been accomplished "by means of causing physical injury to [DePietro]."[18] We note that this language mirrors the relevant model criminal instruction. See Connecticut Criminal Jury Instructions 4.3-3, available at https://www.jud.ct.gov/JI/Criminal/Criminal.pdf (last visited July 22, 2021).

Although the briefing on the question is not entirely clear, the defendant appears to contend that the jury could have possibly been misled in at least two distinct ways. First, the defendant argues that the trial court's instructions "virtually eliminated" the element of causation and that, as a result, the jury was given a false impression that DePietro's injuries need not have actually been connected to the defendant's conduct in any way. (Internal quotation marks omitted.) In support of this argument, the defendant has hypothesized that DePietro's injuries could have been caused by "shoveling snow" or "sleeping wrong." (Internal quotation marks omitted.) This argument is completely without merit. The court's charge, set forth previously in this opinion, clearly required the state to prove beyond a reasonable doubt that "the defendant . . . caused physical injury to [DePietro]."

Reduced to its essence, the defendant's principal argument on the point appears instead to be that, in the absence of the requested instruction on proximate causation, the jury was effectively relieved of the need to consider whether DePietro's injuries were a sufficiently direct result of an action undertaken with the requisite specific intent. We reject this argument as well. The trial court expressly instructed the jury that the specific intent required by the statute—namely, an intent to prevent DePietro from performing his duties—must have been effectuated "by means of causing physical injury to [DePietro]." In light of this instruction, we perceive no reasonable possibility that the jury could have been misled to believe that an injury caused without the required intent would suffice.[19] For the foregoing reasons, we conclude that the trial court's instructions, viewed as a whole, fairly presented the issues raised at trial and that, therefore, there is no reasonable possibility that the jury was misled. As a result, the defendant's claim of instructional error with respect to this charge must fail.[20]

In summary, we conclude that the trial court incorrectly concluded that Santiago possessed a reasonable and articulable suspicion to detain the defendant in the library parking lot on the evening of July 19, 2015. As a result of the state's concession that this conclusion is dispositive, the defendant is entitled to a judgment of acquittal on the two counts charged in the information in the first case. Because the state has also conceded the existence of a reversible instructional error with respect to the charge related to the defendant's assault on Varone, the defendant is entitled to a new

trial on the first count of the information in the second case. Having concluded that the defendant's various claims with respect to the assault on DePietro lack merit, the conviction on the second count of assault in the second case must stand.

The judgment of conviction in the case relating to the events of July 19, 2015, is reversed and that case is remanded with direction to render a judgment of acquittal on all counts charged in that information; the judgment of conviction in the case relating to the events of July 22, 2015, is reversed only with respect to the count pertaining to the assault on Varone, and the case is remanded for a new trial with respect to that count; the judgment of conviction in the case relating to the events of July 22, 2015, is affirmed with respect to the count pertaining to the assault on DePietro.

In this opinion the other justices concurred.

* July 23, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] Each of the charges related to this event stem from the defendant's refusal to comply with various orders by the police after his detention. In addition to his argument related to the motion to suppress, the defendant also argues that, if the initial detention was unconstitutional, he cannot legally be punished for ignoring the orders that followed.

[2] Santiago was conducting a routine patrol of the area in a marked police cruiser. Although Santiago testified that the library had been broken into once several years before and that a series of more recent larcenies had occurred at a nearby mall, the record contains no indication that the police had received any reports of crimes or other suspicious activity in the area on that particular evening.

[3] Numerous photographs of the parking lot admitted into evidence at trial depict no posted rules restricting access to the parking lot or any signage prohibiting trespassing.

[4] Santiago gave the following specific testimony on this point: "By the time I got back, I saw the person was quickly going to their car and pulling out of the parking space as I pulled in . . . ."

[5] At this point, the defendant began recording a video on a dashboard camera. That video recording, which ran for the duration of the relevant events that evening, was admitted into evidence at trial.

[6] Santiago testified that he was skeptical of this explanation because individuals who access the library's Wi-Fi from the parking lot typically park closer to the entrance of the library in order to get a stronger signal. Santiago also testified, however, that there were no picnic tables near the entrance and that, although the signal might not be strong enough for tasks like "web surfing or streaming," a connection from that location was still possible.

[7] The record contains conflicting evidence about precisely when Santiago first observed the open gate. At some points, Santiago testified that he noticed the gate when he first entered the parking lot that evening. At other points, he testified that he had noticed the gate only after his initial conversation with the defendant. Although the trial court made no factual finding on this particular point, on appeal, the parties agree that Santiago's latter testimony reflects the actual sequence of events that evening.

[8] The defendant appealed to the Appellate Court from the judgments of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[9] Although the defendant may not have parked in the same spot typically used by other Wi-Fi users, it is undisputed that he was still located on the side of the parking lot closest to the library and that the picnic tables were only approximately thirty feet away from the building. There is also no indication in the record that the defendant would have known that a stronger signal might have been available at another location.

[10] Because the parties agree that Santiago was unaware of the open fence gate when he seized the defendant; but see footnote 7 of this opinion; we need not consider that fact in our analysis. See *State* v. *Clark*, supra, 297

Conn. 9–10.

[11] As noted previously in this opinion, the trial court vacated the defendant's conviction of interfering with DePietro in violation of § 53a-167a (a) on double jeopardy grounds prior to sentencing.

[12] Although the state has conceded that the defendant's conviction with respect to the assault on Varone must be reversed because of instructional error, we must still address the defendant's first two sufficiency claims because they would, if successful, entitle him to a judgment of acquittal on that charge. See, e.g., *State* v. *Padua*, 273 Conn. 138, 178, 869 A.2d 192 (2005) ("sound appellate policy and fundamental fairness require a reviewing court to address a defendant's insufficiency of the evidence claim prior to remanding a matter for retrial because of trial error").

[13] We observe that defense counsel also made this particular argument during the course of closing arguments and that, in returning verdicts finding the defendant guilty, the jury implicitly rejected it.

[14] The defendant's briefing appears to assume that Varone's decision to prevent the defendant's egress and his decision to bring the defendant to the ground were made simultaneously. Although the various recordings admitted into evidence undoubtedly show a rapid progression of events, the jury reasonably could have credited Varone's specific testimony to the contrary.

[15] The full colloquy between DePietro and the prosecutor reads as follows:

"Q. Now, as a result of this you were assisting . . . Varone did you, yourself, sustain any kind of an injury or any kind of pain, anything of that nature?

"A. Well, the next day, when I came into work, I had some neck pain and some back pain, I was very sore from the fight. It . . . just wasn't, you know, going to the ground and putting handcuffs on [the defendant]. [I]t was a fight, a full on fight. And he's a little bigger than I am. But even with . . . Varone and I, it was a full on fight. And the next day, you know, I was sore. My neck hurt and my back hurt.

"Q. Okay. And how long . . . did your back hurt you?

"A. Oh, I reported to Sergeant Dunn the next day that I was having the pain. Then I went into my days off, and I ended up taking one extra day off, which was a Sunday before I returned to work.

"Q. Because of the pain?

"A. Oh, yes, because of the pain."

[16] The defendant's initial briefing of this sufficiency claim focused on the issue of whether the state had proven a type of injury punishable under § 53a-167c, arguing that an interpretation of physical injury that encompasses an officer who merely feels "sore" would "lead to absurd and unworkable results . . . ." The state's brief responded in kind. In his reply brief, the defendant contended that his sufficiency claim with respect to DePietro had also focused on the issue of whether the defendant's *own volitional acts* had caused DePietro's injuries. Even if this latter claim had been raised distinctly in the context of the defendant's initial sufficiency argument, which it was not, we would reject it. DePietro testified that he was injured during the course of the fight itself; see footnote 15 of this opinion; and, as discussed previously, the jury could have reasonably concluded that the defendant had engaged in that struggle with the conscious purpose of delaying his own arrest.

[17] The defendant's proposed instruction on causation provided: "It is necessary . . . that the defendant's conduct is the cause without which the injury would not have occurred and the predominating cause or the substantial factor from which the injury follows as a natural direct and immediate consequence. In other words, the state must prove that [the defendant's deliberate conduct] . . . was the proximate cause of the [injury claimed]."

[18] The trial court's initial recitation of this instruction related to the first count of the second information, which alleged that the defendant had assaulted Varone. The trial court's instructions on the second count of that same information, which related to the assault on DePietro, simply referred the jury back to the instructions previously provided.

[19] Even if some ambiguity remained on the point, the defendant still would not have been entitled to a more detailed instruction on causation because the evidence actually adduced at trial did not sufficiently develop an alternative theory of causation. Although testimony offered during the state's case-in-chief established that DePietro, together with the assistance of multiple other officers, had helped to move the defendant after the struggle in the lobby, the defendant made no attempt—through cross-examination or otherwise—to suggest that this activity had actually been the source of DePietro's

injuries. Defense counsel's questioning of DePietro focused, instead, on the question of whether those injuries existed at all.

[20] In the closing pages of his principal brief, the defendant identifies a series of thirteen allegedly improper statements made by the prosecutor during the course of closing arguments. Of those, only four relate to the events that occurred in the lobby of the police department. In three of those four statements, the prosecutor simply prefaces an argument that the actions taken by the police that day were reasonable with the phrase, "I respectfully submit" or other language to the same effect. The state bore the burden of proving the point; see, e.g., *State* v. *Davis*, supra, 261 Conn. 570–71; and each of these three particular statements appears to reference only evidence contained within the record. Viewed in context, we do not believe that these remarks can be fairly characterized as a form of unsworn testimony. See, e.g., *State* v. *Luster*, 279 Conn. 414, 436, 902 A.2d 636 (2006). The singular comment that remains is a statement in which the prosecutor argued to the jury that the defendant would have been aware of the policy prohibiting the retention of personal effects in the booking area because he had previously reviewed the Clinton Police Department's manual pursuant to a freedom of information request. The defendant's briefing, however, contains no analysis as to how this particular comment, as distinct from his broader allegations that the prosecutor was "vouching" for the reasonableness of the conduct of the police, deprived him of his due process right to a fair trial. As a result, we conclude that the claim of prosecutorial impropriety with respect to that statement was inadequately briefed. See, e.g., *State* v. *Buhl*, 321 Conn. 688, 724, 138 A.3d 868 (2016) ("[a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly" (internal quotation marks omitted)).

————————————————